**Ex parte Ronald Allan WILSON, Appellant.**

**No. 59775**

Court of Criminal Appeals of Texas, En Banc,

Oct. 17, 1979.

---

Carol S. Vance, Dist. Atty. and Douglas M. O'Brien, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

OPINION

DALLY, Judge.

This is a post-conviction writ of habeas corpus proceeding.

On May 15, 1975, petitioner was convicted for a violation of the Controlled Substances Act, the alleged offense being possession of phentermine. The punishment assessed was imprisonment for five years. On appeal, the contention now presented was not raised and the judgment was affirmed in a per curiam opinion.

Petitioner now contends, and the State in its brief agrees, that he is unlawfully imprisoned for the reason stated in *Riddle v. State*, 560 S.W.2d 642 (Tex.Cr.App.1977) and *Lumberas v. State*, 560 S.W.2d 644 (Tex.Cr.App.1977). In those cases, involving prosecutions for a misdemeanor under the Dangerous Drugs Act, Art. 4476–14, V.A.C.S., we stated that phentermine had been removed from the Dangerous Drugs Act and placed in Schedule IV of the Controlled Substances Act, Art. 4476–15, V.A.C.S., but phentermine had not been added to any of the penalty groups of the Controlled Substances Act. We said that as a consequence no penalty was provided for the possession or delivery of phentermine.

We have reexamined the opinions in *Riddle* and *Lumberas* in light of the opinion in *Ex parte Ashcraft*, 565 S.W.2d 926 (Tex.Cr.App.1978). This reexamination convinces us that we were correct in holding that phentermine was not a dangerous drug and in reversing those convictions under the Dangerous Drugs Act. At the time *Riddle* and *Lumberas* were decided, Sec. 2(a) of the Dangerous Drugs Act provided, among other things, that a dangerous drug was "any drug or device that is not included in Schedules I through V of the Texas Controlled Substances Act . . ." Phentermine was, and is, listed in Schedule IV of the Controlled Substances Act, Sec. 2.06(d)(2). Also, isomers of methamphetamine were, and are, listed in Schedule II of the Act, Sec. 2.04(d)(2).[1] However, we erred when

---

1. Effective May 2, 1979, Sec. 2(a) of the Dangerous Drugs Act was amended to read:

"(a) The term 'dangerous drug' means any drug or device that is not included in Penalty

we went on to state, in dictum not necessary to the result reached in *Riddle* and *Lumberas,* that phentermine was not included in a penalty group of the Controlled Substances Act and there was no penalty provided for its possession or delivery.

Methamphetamine, including its salts, isomers, and salts of isomers, has always been listed in Penalty Group One of the Controlled Substances Act, Sec. 4.02(b)(6). Isomeric compounds are composed of the same elements united in the same proportions by weight, but differ in one or more properties because of a difference in structure. Webster's New International Dictionary (2d ed. 1957). Methamphetamine and phentermine have the same chemical composition, noted as $C_{10}H_{15}N$, and have the same molecular weight, 149.2. Merck Index, pp. 775, 944 (9th ed. 1976); Martindale, The Extra Pharmacopoeia, pp. 86, 314 (27th ed. 1977). Methamphetamine and phentermine are structural isomers, i. e., compounds having the same chemical composition, but differing in the arrangement of the component elements. 15 Encyclopedia Americana, p. 514 (1976). The testimony of Floyd E. McDonald, Director of the Houston Police Laboratory, which appears in the records of this Court from the previous appeal of this case, is consistent with this conclusion. He testified phentermine is an isomer of methamphetamine.

Since phentermine is an isomer of methamphetamine, we were in error when we stated in *Riddle* and *Lumberas* that there was no penalty provided for its possession or delivery. Phentermine was then and is now a controlled substance, and was then and is now subject to criminal prosecution under the Controlled Substances Act. On the other hand, we were correct in denying relief in *Ashcraft,* since in that case the State was prosecuting the felony offense and had alleged that phentermine is an isomer of methamphetamine.

The indictment on which petitioner was convicted alleges that on or about July 26, 1974, petitioner "knowingly and intentionally possess[ed] a controlled substance, namely: phentermine . . ." Unlike the indictment in *Ashcraft,* the indictment does not allege that phentermine is an isomer of methamphetamine. Thus, we are called upon to determine whether such an allegation is necessary in order to prevent the indictment from being fundamentally defective.

In *Taylor v. State,* 172 Tex.Cr.R. 461, 358 S.W.2d 124 (Tex.Cr.App.1962), a prosecution under the old Narcotic Drug Act, Art. 725b, V.A.P.C. (1925), the indictment alleged the unlawful possession of "a narcotic drug, to-wit: dolophine . . ." Dolophine was not specifically named in Art. 725b, supra, but the proof showed that it was a narcotic drug of the same chemical formula as amidone, which was named in the Act. We held that the indictment was sufficient to allege an offense and not fundamentally defective.

In *Henley v. State,* 387 S.W.2d 877 (Tex. Cr.App.1964), the indictment alleged the unlawful sale of "a narcotic drug, to-wit: Paregoric . . ." We held that the trial court did not err in overruling the defendant's motion to quash the indictment, stating:

"While paregoric is not included within the statutory definition of a narcotic drug, the proof shows that it is, in fact, a narcotic drug known under the official name of 'camphorated tincture of opium' and that it contains morphine which comes from opium, a narcotic drug enumerated in the statute."

Groups I through IV of the Texas Controlled Substances Act and that is unsafe for self-medication, and includes the following:

"(1) Procaine, its salts, derivates, or compounds or mixtures thereof except ointments and creams for topical application containing not more than two and one-half percent (2½ %) strength.

"(2) Any drug or device which bears or is required to bear the legend: Caution: federal law prohibits dispensing without prescription, or the legend: Caution: federal law restricts this drug to use by or on the order of a licensed veterinarian."

This amendment does not alter our conclusion that phentermine is not a dangerous drug. Isomers of methamphetamine, of which phentermine is one, are listed in Penalty Group One of the Controlled Substances Act, Sec. 4.02(b)(6),

In *McClanahan v. State*, 394 S.W.2d 499 (Tex.Cr.App.1965), the defendant was charged with the unlawful sale of "a narcotic drug, to-wit: demerol . . ." We held that while Demerol was not named in Art. 725b, supra, the trial court did not err in instructing the jury that Demerol was a narcotic drug, since the proof showed that Demerol was the trade name of isonipecaine, which was named in the Act. On rehearing, we further held that the indictment was not unconstitutionally indefinite.

In *Crockett v. State*, 511 S.W.2d 519 (Tex. Cr.App.1974), the information alleged the unlawful attempt to obtain "a dangerous drug, to-wit: Talwin, by use of a forged prescription. . . ." We held that the information was fundamentally defective since Talwin was not named in the applicable statute, former Art. 726d, Sec. 2, V.A. P.C. (1925). We rejected the State's argument that the information was sufficient to state an offense because the proof showed that Talwin was a legend drug, and hence a dangerous drug under Sec. 2(20) of Art. 726d, supra.

In *Jackson v. State*, 572 S.W.2d 551 (Tex. Cr.App.1978), the information alleged the unlawful possession of "a dangerous drug, namely TETRACYCLINE . . . ." Noting that tetracycline is not specifically designated a dangerous drug under the Dangerous Drugs Act, Art. 4476–14, V.A. C.S., we held that the information was fundamentally defective based on the decision in *Crockett*.

Our opinions in *Taylor, Henley,* and *McClanahan* are in conflict with our more recent opinions in *Crockett* and *Jackson*. We are satisfied that the rule stated in the latter opinions is correct, and accordingly we overrule *Taylor, Henley* and *McClanahan* to the extent they conflict with *Crockett, Jackson* and this case.

*Ex parte Charles*, 582 S.W.2d 836 (Tex.Cr. App.1979), was a felony prosecution under the Dangerous Drugs Act for delivery of sinequan. Sinequan is not named in Sec. 2(a) of the Act, but is a legend drug and therefore subject to the Act. However, the indictment in *Charles* did not allege that

sinequan is a legend drug, and we held that this omission rendered the indictment ineffective to state an offense. We stated the reason for this holding as follows:

"[S]inequan is not listed by name in the Dangerous Drug Act; therefore, it is necessary to allege facts showing why sinequan is a dangerous drug. An indictment should allege all that the State is required to prove. Art. 21.03, V.A.C.C.P., and see *Benoit v. State*, 561 S.W.2d 810 (Tex.Cr.App.1977).

"Drugs which bear a legend: 'Caution: federal law prohibits dispensing without a prescription' are dangerous drugs. Art. 4476–14, Sec. 2(a)(3), V.A.C.S. Assuming . . . that sinequan is a dangerous drug because it bears that legend, it would be necessary for the State to prove that it was a dangerous drug because it bears that legend. Since an indictment should allege all that the State is required to prove, Art. 21.03, V.A.C.C.P., and *Benoit v. State*, supra, it would be essential for the State to allege that sinequan is a dangerous drug because it bears the legend: 'Caution: federal law prohibits dispensing without a prescription.' The indictment fails to allege an essential element of the offense, because it fails to allege why sinequan is a dangerous drug. The relief sought must be granted." 582 S.W.2d at 837.

The same reasoning is applicable to the instant case. Petitioner was indicted for possession of phentermine. Phentermine is not named in a penalty group of the Controlled Substances Act, but is subject to the Act because it is an isomer of methamphetamine. Since it was necessary for the State to prove that phentermine is an isomer of methamphetamine in order to convict petitioner, it was equally necessary for the State to allege this fact in the indictment.

■ To state the rule generally, we hold that in a prosecution under the Controlled Substances Act for the manufacture, delivery, or possession of a substance not specifically named in a penalty group but which is otherwise described in a penalty group (for example, an isomer of methamphetamine),

such description is an essential element of the offense which must be alleged in the indictment in order to state an offense. The same rule applies to prosecutions under the Dangerous Drugs Act involving a drug not specifically named in Sec. 2(a) but which is otherwise described therein (for example, a legend drug).

■ The indictment in this case does not allege that phentermine is an isomer of methamphetamine; that is, the indictment does not allege why phentermine, a substance not listed by name in a penalty group, is a controlled substance. Therefore, the indictment fails to allege an essential element of the offense and is fundamentally defective. The relief sought is granted.

It is so ordered.

DOUGLAS, J., dissents.

CLINTON, Judge, concurring in part and dissenting in part.

Phentermine is a rather innocuous stimulant prescribed as an appetite suppressant in treating obesity. Being unable to subscribe to the anomalism of possession of phentermine carrying a misdemeanor penalty one season, going without any penalty whatsoever during another and then being upgraded to a second degree felony offense in the present season—the latter two changes made *without direct legislative enactment*[1]—I must respectfully dissent to all but the result.

From the time the Legislature of Texas first proscribed possessing "any drug that bears the legend: 'Caution: federal law

prohibits dispensing without prescription',[2]" possession of a legend drug, including phentermine whenever it became one until August 28, 1973,[3] was a misdemeanor offense. Penalties were decreased or increased from time to time to the present punishment of a fine not to exceed $1,000.00 or confinement in jail for a period not to exceed 6 months, or both.[4]

*Riddle v. State*, 560 S.W.2d 642 (Tex.Cr. App.1977) and *Lumberas v. State*, 560 S.W.2d 644 (Tex.Cr.App.1977), hard on the heels of *Riddle*, decided that the action of the Commissioner in adding phentermine to Schedule IV of the Texas Controlled Substances Act resulted in there being "no penalty provided for the possession or delivery of phentermine," *Riddle*, supra, at 644.[5] This conclusion was reached on the rationale that since the dangerous drug act defines a dangerous drug as one "that is *not* included in Schedules I through V of the Texas Controlled Substances Act," the action of the Commissioner of Health had the legal effect of removing phentermine from its classification as a dangerous drug, so that the penalty provisions of the dangerous drug act no longer applied to otherwise unlawful acts involving phentermine.

Thereafter, at some point not revealed by our research of opinions of this Court or other source material, at least at the time petitioner in *Ex parte Ashcraft*, 565 S.W.2d 926 (Tex.Cr.App.1978) was indicted, a compensating strategy had been developed in some quarters. The notion was to allege the offense as possessing "phentermine, an isomer of methamphetamine," prove the allegation by competent testimony and, if the

1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated. Further, use of the collective "we" and "our" was in a different original posture; they should now be read as "I" and "my."

2. See Historical Note following Article 4476–14, V.A.C.S., formerly Article 726d, V.A.P.C., originally enacted by Acts 1959, 56 Leg., p. 923, ch. 425.

3. That is the date phentermine was added to Schedule IV of the Texas Controlled Substances Act by the Commissioner of Health after it had been added to Schedule IV of the Federal Drug Enforcement Administration List

of Controlled Substances, published in the Federal Register on July 6, 1973. See *Riddle v. State*, 560 S.W.2d 642, footnote 2 at 644 (Tex. Cr.App.1977).

4. Article 4476–14, Section 15(a), V.A.C.S.

5. The *ratio decidendi* without which the conclusion could hardly have been reached is now unashamedly labeled by the majority as mere "dictum." Yet in *Lumberas* the Court flatly states, "In *Riddle* we *held* that there is 'no longer any penalty provided for the possession or delivery of phentermine.'"

evidence is otherwise sufficient, convict the offender for a second degree felony for which the penalty is confinement for any term of not more than 20 years or less than 2 years. That the strategy succeeded is demonstrated by the fate of Ashcraft, whose term of confinement is not reflected by the opinion in his case, and is further shown by the punishment meted to petitioner in this case, imprisonment for .5 years, and by the majority opinion rendered herein.

Again, these seasonal changes from the spring of misdemeanor punishment through the carefree summer of unrestrained conduct on through to the winter of discontent at felony confinement were all made without an intentional or knowing legislative modification of the calendar. Changing the metaphor, the exquisite irony of the phentermine ball being volleyed about is that when the Commissioner served it into Schedule IV because the Federal authorities had done so, he and they could act only after making certain findings as prescribed in the Federal act and Section 2.13 of the Texas Controlled Substances Act:

> "The Commissioner shall place a substance in Schedule IV if he finds that:
>
> (1) the substance has a low potential for abuse relative to substances in Schedule III;
>
> (2) the substance has currently accepted medical use in treatment in the United States; and
>
> (3) abuse of the substance may lead to limited physical dependence or psychological dependence relative to the substances in Schedule III."

As originally enacted by the Legislature, and without substantial change since then, the substances placed in Schedule IV were, without readily ascertainable exception, those placed in Penalty Group 3 by the Legislature—the penalty for which being that provided for a Class A misdemeanor! On the other hand, methamphetamine is a Schedule II substance, meaning, as provided by Section 2.11 of the Controlled Substances Act, that it has "high potential for abuse," has currently accepted medical use in treatment in the United States or currently accepted medical use "with *severe* restrictions" and its abuse may lead to "*severe* psychological or physical dependence." [6]

After the Attorney General of the United States, acting on findings and recommendations of the Secretary of Health, Education and Welfare, finally placed amphetamine, methamphetamine and phentermine in the respective schedule he found appropriate upon findings mandated by Congress— which are the same prescribed by our Legislature in delegating authority to the Commissioner—amphetamine and methamphetamine ended up in Schedule II, 21 CFR § 1308.12(d),[7] while phentermine was assigned to Schedule IV, 21 CFR § 1308.14(d).[8] Again, along with the action of our own Commissioner, express recognition and acknowledgments that phentermine is to be regarded and treated quite differently from methamphetamine under the law.

Given this remarkable state of affairs, then, the penal consequences of possessing phentermine depended not on a legislative pronouncement of offenses and classification of penalties but on such uncertain conditions as the scholarship of a prosecuting attorney [9] and availability of a willing ex-

---

**6.** A relative of methamphetamine is amphetamine which, in Schedule II, Section 2.04(d), is characterized, along with methamphetamine, as having a potential "for abuse associated with a stimulant effect on the central nervous system" but, unlike methamphetamine, is in Penalty Group 3, Section 4.02(d)(1)(A), the punishment for possession of which is as a Class A misdemeanor.

**7.** "(d) *Stimulants.* * * *
(1) Amphetamine, its salts, optical isomers, and salts of its optical isomers  . . .

(2) Methamphetamine, its salts, isomers, and salts of its isomers  . . ."

**8.** "(d) *Stimulants.* * * *
(1) . . .
(2) Phentermine  . . ."

**9.** Is he under the impression that phentermine is still a dangerous drug or has he learned that it was placed in Schedule IV and stripped of penalties or is he alert to the *Ashcraft* ploy?

pert witness.[10] The liberty of a citizen should be and is intended under our form of government to be vouchsafed by firmer guarantees.

Profoundly distressed in these circumstances, we felt obliged to explore pertinent legislative history and, having done so, have discovered illuminating material that lights the way to our conclusion as to what the Legislature actually intended.[11]

The Texas Controlled Substances Act was initiated in the legislative process by introduction of House Bill 447, 1973 House Journal 587. The Bill tracked a model controlled substances act that had been submitted to the several states by an agency of the Federal government; the model bill, in turn, followed the format and contained provisions similar to the Federal Controlled Substances Act. That is, for both regulatory and penal purposes all substances to be controlled were categorized into *schedules*. There were no penalty groups. Consistent with that concept, House Bill 447 proposed to repeal in its entirety the Texas Dangerous Drug Act, Article 726d, 1925 Penal Code.

Along the legislative way a complete substitute for the original bill was prepared and presented, 1973 House Journal 2857. For some reason not reflected in the legislative journals, the substitute, while retaining the schedule format without separate penalty groups, proposed to amend enumerated sections of Article 726d rather than repeal it entirely.[12] Amendments to the Dangerous Drugs Act were in § 6.03 of the substitute bill under the heading "Conforming Amendments," and for the first time appeared the language defining a dangerous drug by adding the phrase "that is not

included in Schedules I through V" of the Controlled Substances Act, *id.* at 2886. Other amendments were made to provisions relating to marihuana and still further conforming amendments dealing with matters other than the Dangerous Drugs Act were added to § 6.03. Thus the substitute for H.B. 447 passed by the House of Representatives.

Senate consideration began with another substitute originating in its own jurisprudence committee. The Senate substitute in its § 6.15 proposed to repeal in its entirety the Dangerous Drugs Act. Also, it departed from the concept of characterizing substances into schedules for both regulatory and penal purposes, adding particularized *penalty* groups. In this fashion, all drugs became controlled substances to be regulated by schedules but penally proscribed by groups.

Each House, then, demonstrated clearly its desire and will that a legend drug such as phentermine be regulated and subject to criminal penalties under either the Controlled Substances Act or the Dangerous Drugs Act. The determination of which, originally to be made by the Legislature itself, was delegated to the Commissioner. Either way, though, prescribed unlawful acts were penal offenses with penalties of confinement, fine or both.

The Senate version was returned to the House where, on May 21, its members refused to concur with the Senate amendments. Conferees were appointed and the Conference Committee made its report May 28—the eve of adjournment. As it came from conference, House Bill 447, a mix of both bills, contained provisions for *penalty* groups, as well as *schedules*. Section

---

10. A witness prepared to opine that phentermine is an isomer of methamphetamine rather than an amphetamine-like drug.

11. Unjust, absurd or unreasonable consequences of reading and enforcing a penal statute literally are to be avoided in construing a statute, and courts are bound to presume that such consequences were not intended and adopt a construction which will promote the

purpose for which legislation was passed. *Newsom v. State*, 372 S.W.2d 681 (Tex.Cr.App. 1963).

12. Our surmise is that proponents of the substitute deemed it appropriate to retain some measure of regulatory authority in the State Board of Pharmacy.

6.03(a), however, remained untouched, continuing to read as it did when the Bill passed out of the House. In other words, having accepted the concept of schedules for regulatory purposes only and penalty groups for penal offenses, the Conference Committee did not modify the definition of dangerous drugs to comport with the new concept.

The primary rule of statutory construction is to ascertain and give effect to intent of the legislative body, *Cousins v. Sovereign Camp, W.O.W.*, 120 Tex. 107, 35 S.W.2d 696. By definition, the Code Construction Act, Article 5429b–2, V.A.C.S., is not applicable to either the Controlled Substances Act or the Dangerous Drugs Act,[13] but this Court has previously considered many of the matters enumerated in § 3.03 of the Act[14] in construing a statute, as in *Newsom v. State*, 372 S.W.2d 681 (Tex.Cr.App.1963).[15] We believe that resort to those construction aids is not precluded and have been guided by some of them in giving consideration to the matter, in coming to the conclusion we have. Thus we are impressed by the facts and circumstances outlined above which demonstrate conclusively that at all times before the Conference Committee report was written every legislative undertaking was clearly designed to continue penal proscriptions regarding dangerous drugs— whether included in a schedule or a penalty group or retained in remnants of the old Act. Stated another way, there is not the slightest suggestion in any of the legislative history of sentiment for abandoning criminal prohibitions regarding dangerous drugs. On that subject, we simply cannot bring ourselves to believe that members of the Conference Committee, being also legislative floor leaders in their respective Houses, would deliberately accomplish in conference something so contrary to the clear intent and purpose of each House. Indeed, their rules expressly restrict discussions and actions of conferees "solely to the matters in disagreement between the two Houses. . . ."[16]

We conclude, therefore, that in accepting the House approach of amending the Dangerous Drugs Act rather than repealing it outright, retention by the Conference Committee of § 6.03 phraseology of "schedules" rather than converting it to the Senate concept of "penalty groups" was purely an inadvertent oversight. Given the structure erected by the Conference Committee from the material supplied by each House, we are firm in the judgment that the true intent of both Houses and the Conference Committee is achieved by reading § 6.03(a) as it amends subsection (a), § 2, of old Article 726d, now Article 4476–14, V.A.C.S., in terms of "penalty groups" rather than "schedules."[17]

---

13. See, e. g., *Harris County v. Suburban Utility Co.*, 547 S.W.2d 72, 74 (Tex.Civ.App.—Houston (1st Dist.) 1977, no writ).

14. "Section 3.03. In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the
   (1) object sought to be attained;
   (2) circumstances under which the statute was enacted;
   (3) legislative history;
   (4) common law or former statutory provisions, including laws upon the same or similar subjects;
   (5) consequences of a particular construction;
   (6) administrative construction of the statute; and
   (7) title, preamble, and emergency provision."

15. "The rule is that in construing a statute its subject matter, reason and effect must be looked to and when a literal enforcement would lead to consequences which the Legislature could not have contemplated, the courts are bound to presume that such consequences were not intended and adopt a construction which will promote the purpose for which the legislation was passed. *Baldridge v. State*, 167 Tex.Cr.R. 519, 321 S.W.2d 309, and cases cited."

16. House Rule 22, Section 8; Senate Rule 96, Texas Legislative Manual.

17. In this my view is fortified by a recent legislative expression of intent and purpose. H.B. 354, Acts 1979, 66th Leg., ch. 90, p. 163 was adopted almost unanimously April 29, 1979, thereafter approved by the Governor and became effective May 2, 1979. Its caption informs, *inter alia*, that it is amending "§ 2(a) . . . relating to the definition of dangerous

Accordingly, phentermine, being a legend drug, and not *then* included in Penalty Groups 1 through 4 of the Controlled Substances Act, *was* criminally prohibited under the Dangerous Drugs Act, and its unlawful possession *was* a Class B misdemeanor as prescribed in § 15, Article 4476–14, V.A.C.S.[18]  The relief should be granted, the felony conviction in Cause No. 218,175 vacated and set aside and, the trial court being without jurisdiction, the indictment dismissed.

drugs." Its § 8 amends § 2(a), in part, to read as follows:

> "(a) The term 'dangerous drug' means any drug or device that is not included in *Penalty Groups* I through IV of the Texas Controlled Substances Act . . . ."

I note use of Roman rather than Arabic numerals but attach no significance to it other than scrivener's choice.

18.  S.B. 322, Acts 1979, 66th Leg., ch. 598, p. 1278 is a comprehensive amendment of the Texas Controlled Substances Act.  It finally passed the Legislature May 28, 1979, as did H.B. 1096 which appears to be exactly the same legislation.  Section 4 amends Schedule IV to add in its subsection (d) as Item (2), phentermine and § 6 amends certain subsections of § 4.02, Texas Controlled Substances Act, by including in its subsection (d), Penalty Group 3(11) as Item (I), phentermine.  Possession of phentermine is now under § 4.04(b)(3) a Class A misdemeanor.  In tandem with H.B. 354, this legislation moots the opinions of this Court in such cases as *Riddle, Lumberas,* and *Ashcraft,* supra, and their progeny insofar as they are based on the proposition that phentermine was either not a dangerous drug or was a controlled substance in some penalty group of that Act.