Donald Wayne DOWLING, Appellant,

v.

The STATE of Texas, Appellee.

No. 107–89.

Court of Criminal Appeals of Texas, En Banc.

Oct. 14, 1992.

Opinion Clarifying and Modifying Holdings on Rehearing June 29, 1994.

Danny D. Burns, Fort Worth, Bill Leonard, Cleburne, for appellant.

Dan M. Boulware, Dist. Atty., and Lisa K. Maddux, Asst. Dist. Atty., Cleburne, Robert Huttash, State's Atty., and Matthew W. Paul, Asst., State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S MOTION FOR REHEARING ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

MALONEY, Judge.

Our prior opinion in this cause is withdrawn.

A jury convicted appellant of manufacture of amphetamine weighing more than four hundred grams and assessed punishment at sixty-one years imprisonment and a $10,000 fine. TEX.REV.CIV.STAT.ANN. art. 4476–15, §§ 4.02(d)(1)(A), 4.032(c) and (d)(2) (Vernon Supp.1983).[1] The Tenth Court of Appeals affirmed the conviction in an unpublished opinion. *Dowling v. State*, No. 10–88–099–CR (Tex.App.—Waco Nov. 17, 1988).

Appellant leased a house in Johnson County in the summer of 1983. In September of 1983, the landlord went to the house looking for appellant who was late with the rent. When no one answered, the landlord entered the house and smelled a foul odor and discovered a homemade laboratory. Thereafter, the landlord notified the authorities who obtained a search warrant for the house and discovered a flask and laboratory equipment. At trial, a chemist with the Texas Department of Public Safety, testified that the entire substance in the flask weighed 704.89 grams, including adulterants and dilutants.[2] She did not further identify the adulterants and dilutants, nor did she testify as to the

amount of the amphetamine in the flask, but she did testify that most of the remainder were bi-products of the manufacturing process and unused precursors.[3]

Appellant contends that the evidence is insufficient to prove he manufactured over four hundred grams of amphetamine as alleged in the indictment. Specifically, the Court of Appeals held that the evidence was sufficient because the remainder of the solution was an adulterant or dilutant and because the Controlled Substances Act prohibits the manufacture of any compound, mixture, material, or preparation containing any quantity of amphetamine. *Dowling*, slip op. at 2–3.

We granted appellant's petition for discretionary review to determine whether the evidence was insufficient to prove that appellant manufactured over four hundred grams of amphetamine as alleged in the indictment.[4]

On original submission, we held that the issue of adulterants and dilutants concerning calculation of weight for punishment purposes does not apply to manufacturing cases, and that precursors can be included in the aggregate weight of a controlled substance in manufacturing cases when assessing punishment. We also held that the weight of the controlled substance includes the "medium" in which the amphetamine is found because the term "controlled substance" is defined as "any material, compound, mixture, or preparation which contains any quantity ... of amphetamine." TEX.REV.CIV.STAT.ANN. art. 4476–15, § 4.02(d)(1)(A).[5] In his motion for rehearing, appellant contends that we have misconstrued the Texas Controlled Substances Act and its legislative intent. We agree albeit for different reasons.

---

1. Now TEX.HEALTH & SAFETY CODE ANN. §§ 481.103(a)(3), 481.113(c) and (d)(2). All citations in the text of this opinion are to the Texas Controlled Substances Act as it existed at the time of the alleged offense in 1983. The current citations are to the Act as it exists in 1992. In 1983, amphetamine was a Penalty Group 3 substance, now it is within Penalty Group 2. This change does not affect our discussion of the offense.

2. This testimony was elicited in response to the State's questions assuming the presence of adulterants and dilutants.

3. Out of the jury's presence, the chemist did testify that 76.20 grams of the substance were amphetamine.

4. We also granted appellant's petition on two other grounds for review, but because of our disposition of appellant's first ground for review, we will not address the others.

5. Now TEX.HEALTH & SAFETY CODE ANN. § 481.103(a)(3).

## I.

### Adulterants and Dilutants

■ We have defined adulterants and dilutants as "compounds, substances or solutions added to the controlled substance with the intent to increase the bulk of the product. Or, increase the quantity of the final product 'without affecting its activity.'" *McGlothlin v. State*, 749 S.W.2d 856, 860 (Tex.Cr.App. 1988); *see also Cawthon v. State*, 849 S.W.2d 346, 347 n. 4 (Tex.Cr.App. 1992) (op. denying State's motion for reh'g). On original submission we held that the issue of adulterants and dilutants was not applicable to manufacturing cases because *McGlothlin* dealt only with final products and possession cases. However, in *McGlothlin*, we did state that adulterants and dilutants include "agents added during manufacturing which will increase the bulk of the yet unfinished product." *McGlothlin*, 749 S.W.2d at 860 n. 8. The applicable statute in effect at the time of the commission of the offense reads:

Sec. 4.032. (a) [A] person commits an offense if he knowingly or intentionally *manufactures, delivers,* or possesses with intent to *manufacture or deliver* a controlled substance listed in Penalty Group 3 or 4.

(c) A person commits an aggravated offense if the person commits an offense under Subsection (a) of this section and the amount of the controlled substance *manufactured, delivered,* or possessed with intent to *manufacture or deliver* is, by aggregate weight, *including any adulterants or dilutants,* 200 grams or more.

TEX.REV.CIV.STAT.ANN. art. 4476–15, § 4.032(a) and (c) (emphasis added).[6] It logically follows that by grouping manufacturing and delivery offenses together the legislature intended to treat manufacturing cases the same as delivery cases. Since we have heretofore indicated that adulterants and dilutants may be included in the weight determination of the named substance in delivery cases, *see, e.g., Reeves v. State,* 806 S.W.2d

540 (Tex.Cr.App.1990), *cert. denied,* 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991), we, therefore, hold that adulterants and dilutants can be included in determining aggregate weight in manufacturing cases.

■ Here, the indictment alleged that appellant "intentionally and knowingly manufacture[d] and possess[ed] with intent to manufacture and deliver more than 400 grams of a controlled substance, to-wit: Amphetamine." No mention was made of adulterants and/or dilutants in the indictment. The jury charge, however, stated:

Now if you find from the evidence beyond a reasonable doubt that ... [appellant] ... did intentionally or knowingly manufacture a controlled substance, to-wit: Amphetamine, by aggregate weight, *including any adulterants or dilutants,* of more than 400 grams as set forth in the indictment, you will find [appellant] guilty of Manufacture of a Controlled Substance, to-wit, Amphetamine, by aggregate weight, *including any adulterants or dilutants,* of more than 400 grams.

The question here presented is whether the language "including any adulterants and dilutants" in the court's charge must also have been pled in the indictment.[7] The Texas Controlled Substances Act in effect at the time of this offense defined a "controlled substance" as follows:

"Controlled substance" means a drug, substance, or immediate precursor listed in Schedules I through V and Penalty Groups 1 through 4 of this Act.

TEX.REV.CIV.STAT.ANN. art. 4476–15, § 1.02(5).[8] And, we have held that the use of the term "controlled substance" in the indictment does not include the phrase "adulterants and dilutants." *Farris v. State,* 811 S.W.2d 577, 580 (Tex.Cr.App.1990); *Reeves,* 806 S.W.2d at 545 (footnote omitted). Since the indictment did not allege adulterants and ˙dilutants but the jury charge allowed the jury to consider adulterants and dilutants in

---

**6.** Now TEX.HEALTH & SAFETY CODE ANN. § 481.113(a) and (c).

**7.** Because appellant did not object to the charge on the basis that the indictment did not contain the phrase "including any adulterants or dilu-

tants," there is no need to address the propriety of the court's charge. *Reeves,* 806 S.W.2d at 543 n. 4.

**8.** Now *see* TEX.HEALTH & SAFETY CODE ANN. § 481.002(5).

determining weight, the jury was authorized to convict appellant upon a theory different from that alleged in the indictment. *Reeves,* 806 S.W.2d at 543. Because the trial court could not authorize a conviction on a theory not alleged in the indictment, *Martinez v. State,* 641 S.W.2d 526 (Tex.Cr.App.1982), and because the indictment here did not allege adulterants and dilutants, we hold that the State could not prove the existence of adulterants and dilutants as part of the aggregate weight of the controlled substance in order to convict appellant of the aggravated offense of manufacture of more than four hundred grams of amphetamine.

## II.

### Immediate Precursors

■ On original submission, we held that the manufacturing statute provides that immediate precursors may be included in the aggregate weight of the named substance. We agree with our original holding, but note that the State must prove them to be "immediate precursors" as defined in the statute.

The Texas Controlled Substances Act in effect at the time of this offense defined immediate precursors as follows:

> "Immediate precursor" means a substance which the commissioner has found to be and by rule designates as being a principal compound commonly used or produced primarily for use, and which is an immediate chemical intermediary used or likely to be used in the manufacture of a controlled

substance, the control of which is necessary to prevent, curtail, or limit the manufacture of such controlled substance.

TEX.REV.CIV.STAT.ANN. art. 4476–15, § 1.02(15).[9] The Act also defined a "controlled substance" as a "drug, substance, or immediate precursor." § 1.02(5).

At appellant's trial, the chemist testified that most of the remainder were bi-products of the manufacturing process and unused precursors. The State did not prove that the bi-products and unused precursors, were immediate precursors as defined in the statute, nor did it prove that the precursors plus the amphetamine weighed more than four hundred grams. *Cf. Cawthon; Reeves.* Therefore, because the State failed to prove the existence of immediate precursors, it would be improper to include them in the aggregate weight.

## III.

### Material, Compound, Mixture, or Preparation

On original submission, we held that the aggregate weight of the controlled substance includes the "medium" in which the amphetamine is found. The State contends on rehearing that if the mixture contains any quantity of amphetamine, then the entire mixture is a "controlled substance," and the weight of the entire mixture is counted in determining the level of the offense.[10]

---

**9.** The Texas Controlled Substances Act currently defines "immediate precursors" as follows:

> "Immediate precursor" means a substance the commissioner finds to be and by rule designates as being:
> (A) a principal compound commonly used or produced primarily for use in the manufacture of a controlled substance;
> (B) a substance that is an immediate chemical intermediary used or likely to be used in the manufacture of a controlled substance; and
> (C) a substance the control of which is necessary to prevent, curtail, or limit the manufacture of a controlled substance.

TEX.HEALTH & SAFETY CODE ANN. § 481.002(22).

**10.** The State urges this Court to follow recent federal decisions that interpret similar language in federal criminal statutes. · *Chapman v. United*

*States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991); *United States v. Mahecha–Onofre,* 936 F.2d 623 (1st Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991).

The federal scheme punishes an offender who manufactures or distributes a mixture or substance containing a detectable amount of a controlled substance. 21 U.S.C. § 841(a), (b). In *Chapman* the defendants sold ten sheets of blotter paper containing one thousand doses of lysergic acid diethylamide (LSD). Although the LSD weighed only fifty milligrams, the weight of the LSD plus the blotter paper was 5.7 grams. The trial court sentenced the defendants to the mandatory minimum of five years imprisonment for distributing more than one gram of a "mixture or substance containing a detectable amount" of LSD. The United States Supreme Court held that the weight of the blotter paper or other carrier should be included when computing the sentence. Similarly, in *Mahecha–Onofre,* the de-

In answering this question we look to the relevant portion of the Texas Controlled Substances Act in effect at the time of this offense:

> Sec. 4.02(d) Penalty Group 3. Penalty Group 3 shall include the following controlled substances:
>
> (1) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system:
>
> (A) Amphetamine ...

TEX.REV.CIV.STAT.ANN. art. 4476–15, § 4.02(d)(1)(A).[11]

A plain reading of the statute indicates that the legislature intended to prohibit the possession, delivery, or manufacture of materials, compounds, mixtures, or preparations containing amphetamine. In *Reeves*, Judge Miller, writing for the majority, indicated that the State could proceed under the "material, compound, etc." theory if the indictment contained the phrase "material, compound, mixture, or preparation containing amphetamine." *See Reeves*, 806 S.W.2d at 545 n. 5:

> The evidence in this case did show that appellant delivered a 'material, compound, mixture, or preparation' containing some amount of amphetamine, and that the material weighed more than twenty-eight grams. However, the charge to the jury did not allow a conviction under that theory, nor was appellant ever indicted under such allegation.

*Id.*

We therefore hold that the indictment must allege that the accused possessed, delivered, or manufactured a material, compound, mixture, or preparation containing amphetamine if the State is to proceed under such a theory. We also hold that the State must prove the identity of the named substance and that the material, compound, mixture, or preparation weighs the amount alleged in the indictment. *Cf. Cawthon.*

## IV.

### Summary

In summary, the proof of the aggregate weight of a controlled substance must show beyond a reasonable doubt: (1) the identity of the named substance; (2) the weight of the named substance and any proven adulterants or dilutants, if the phrase "including any adulterants and dilutants" is alleged in the indictment; (3) the weight of the named substance and any proven immediate precursors; or, (4) the weight of the named substance and any proven "material, compound, mixture, or preparation" containing the named substance, if that phrase is alleged in the indictment.

In this case, the indictment failed to allege adulterants and dilutants, but the jury was instructed to consider adulterants and dilutants beyond the allegations in the indictment. Even if the trial court had properly instructed the jury, the proof at trial did not establish the existence of adulterants and dilutants. *Cawthon; Reeves.* Nor did the proof show that the pure amphetamine weighed more than four hundred grams. We therefore hold that the evidence is insufficient to support the verdict. Accordingly, we grant appellant's motion for rehearing, reverse the judgment of the Court of Appeals, and remand this cause to the trial court with instructions to enter a judgment of acquittal.

CLINTON, Judge, concurring.

Since the seminal opinion in *McGlothlin v. State*, 749 S.W.2d 856 (Tex.Cr.App.1988), this court has addressed recurring problems created by what the late Judge Duncan characterized as "a part of a complex statutory

---

fendant was convicted of possession with intent to distribute five kilograms or more of "a mixture or substance containing a detectable amount of" cocaine. The defendant attempted to smuggle cocaine through customs by chemically bonding the cocaine to the suitcase. The First Circuit held that the weight of the entire suitcase, less the non-bonded metal parts, should be included in assessing punishment.

We do not find these cases controlling, because, as will be seen in the text of this opinion, in Texas, unlike the federal scheme, the medium in which the named substance is found is not *automatically* included in the aggregate weight of the controlled substance.

11. Now TEX.HEALTH & SAFETY CODE ANN. § 481.103(a)(3).

scheme designed to prohibit the manufacture and possession of a wide variety of controlled substances[, necessitating] expert testimony to properly present and prove a criminal violation of the Act." *Id.,* at 859.[1]

Keeping in mind that V.T.C.A. Penal Code, Title 1, § 1.03(a) dictates, "Conduct does *not* constitute an offense *unless* it is *defined as an offense by statute* [et cetera];" that *id.,* § 1.03(b), *inter alia,* makes provisions of Title 1 (2 and 3) applicable to "offenses defined by other laws, unless the statute defining the offense provides otherwise;" that the Texas Controlled Substances Act does not provide otherwise, we must focus on statutory provisions defining germane offenses. Practice Commentary; see, e.g., *Childress v. State,* 784 S.W.2d 361, at 362 (Tex.Cr.App.1990), and *Gutierrez v. State,* 628 S.W.2d 57, at 61 (Tex.Cr.App.1980). If correct, Part I of the majority opinion is dispositive, and all else is dicta.

Like *McGlothlin* this cause is governed by the 1983 version of the Act, in which offend-

ing *conduct* involving amphetamine is defined as an offense or aggravated offense only in §§ 4.032(a) and (c), and 4.042(a) and (c), respectively. In combination both definitions of an *offense* read in pertinent part, *viz:*

"[A] person commits an offense if he knowingly or intentionally [manufactures, delivers, possesses with intent to manufacture or deliver or possesses] a controlled substance listed in Penalty Group 3[.]"

Similarly, both definitions of an *aggravated offense* read:

"A person commits an aggravated offense if the person commits an offense under Subsection (a) of this section and the amount of the controlled substance [manufactured, delivered, or possessed with intent to manufacture or deliver or possessed] is, by aggregate weight, including any adulterants or dilutants, 200 grams or more." [2]

Here again then are two issues of first impression, *viz:* Do the statutory provisions reveal a legislative intent, first, to take into

---

1. Although indicted and tried as a "possession" case under former article 4476–15, §§ 4.02(d)(1)(A) and 4.042(d)(2) (Acts 1979, 66th Leg. Ch. 598, p. 1278, § 6, at 1289 (Penalty Group 3), and Acts 1983, 68th Leg., Ch. 425, § 11, at 2383 (Possession Offenses in Penalty Group 3), effective August 29, 1983, *McGlothlin* is actually a common "manufacturing" scenario under former article 4474–15, § 4.032(d)(2) (Acts 1983, supra, § 9, at 2377–2378).

The "possession" offense was committed on or about November 30, 1983. But as the affidavit for search warrant alleged and the facts proved demonstrate, defendant was "cooking" amphetamine in a "lab" in his barn, the greatest amount by far being in a flask containing a batch of "mostly water" under a thin organic layer harboring some amphetamine. *McGlothlin v. State,* 705 S.W.2d 851, at 856, 864 (Tex.App.—Fort Worth 1986); see also *McGlothlin,* supra, at 857.

Contemporaneously, the Court similarly decided two companion "possession" cases in a laboratory setting. *Engelking v. State,* 750 S.W.2d 213 (Tex.Cr.App.1988), and *Sloan v. State,* 750 S.W.2d 788 (Tex.Cr.App.1988), followed soon by *Farris v. State,* 811 S.W.2d 577 (Tex.Cr.App. 1990) ("various materials used in manufacturing amphetamine," "white powder" and two containers of liquid along with amphetamine); see also *Cawthon v. State,* 849 S.W.2d 346 (Tex.Cr. App.1992).

*Reeves v. State,* 806 S.W.2d 540 (Tex.Cr.App. 1990), however, was prosecuted under former article 4476–15, § 4.031(a) and (c) (1985 amendment elevating amphetamine to Penalty Group

2); it involved *delivery* of amphetamine in a small bag of "white *wet* powdery type substance," although there is no indication it came from a "lab" on the premises.

The judgments above were reversed for entry of a judgment of acquittal, essentially due to a failure below to understand and appreciate the pivotal significance of the clause "the amount of *the controlled substance ... by aggregate weight, including any adulterants or dilutants* [.]" See *Smith v. State,* 737 S.W.2d 933, 937–938 (Tex. App.—Dallas 1987) PDR refused. None presented a question of the role of *"immediate precursor"* that the majority addresses here. Majority opinion, Part II, at 107–108.

(All emphasis here and throughout this opinion is mine unless otherwise noted.)

2. A § 4.032(a) offense is a third degree felony "if the amount of the substance *manufactured, delivered,* or *possessed* with intent to manufacture or deliver is, by aggregate weight, including any adulterants or dilutants, less than 200 grams." § 4.032(b)

A § 4.042(a) offense is a Class A misdemeanor "if the amount of the controlled substance *possessed* is, by aggregate weight, including any adulterants and dilutants, less than 200 grams." § 4.042(b).

By using of the past tense in each instance, the Legislature manifested that amphetamine, as the controlled substance in question, must be an end product of the manufacturing process, and thus susceptible to being delivered and possessed.

account the weight of an "immediate precursor" in determining the amount of the controlled substance "by aggregate weight, including any adulterants or dilutants;" second, must the charging instrument allege presence of an "immediate precursor" in the controlled substance in question.

According to the court of appeals the DPS chemist described the stuff the State alleged to be amphetamine as follows:

"[The 5000 milliliter flask of dark liquid] contained 704.89 grams of amphetamine, including adulterants and dilutants.... [T]he solution in the flask contained 76.20 grams of amphetamine *base;* that the remainder of the solution was reaction mixture containing bi-products [sic] of the manufacturing process and (some) *unused precursors* (, *unchanged precursors*); and that the amphetamine in the liquid had not been extracted, distilled or separated from the other substances. * * * * [T]hat the solution in the flask was *not ready for distribution as amphetamine;* and that the amphetamine had not been extracted, distilled or separated from the other substances in the flask."

Slip opinion, at 2, 3 (material in parenthesis from 3 S.F. 270).

An "immediate precursor" listed in a schedule and penalty group is in and of itself a prohibited controlled substance. Act 1983, § 1.02(5).

An "immediate precursor" is a "substance" which is authoritatively found to be and designated as being "a principal compound commonly used or produced primarily for use, and which is an immediate *chemical* intermediary used or likely to be used in the *manufacture* of a controlled substance[.]" *Id.,* § 1.02(15).[3]

Possessing a listed "immediate precursor" with *intent to manufacture* another controlled substance is a penal offense and may be prosecuted as such, punishment depending on its "aggregate weight, including any adulterants of dilutants." *Id.,* §§ 4.03(a), 4.031(a) and 4.032(a), Act 1983.[4]

To "manufacture" means the production, preparation, compounding, conversion or processing of a controlled substance (other than marihuana), "either directly or indirectly by extraction from substances of natural origin, or *independently by means of chemical synthesis,* or by a combination of extraction and chemical synthesis[.]" *Id.,* § 1.02(16). See generally *Moffett v. State,* supra, at n. 1.

From the testimony of the DPS chemist in this and other causes, one surmises that in a chemical synthesis an "immediate precursor" is combined and united with one or more other chemical elements in a "cooking" process involving water to produce amphetamine, that ultimately must be distilled or separated from the aqueous solution before it is final product, leaving in the solution only useless by-products and perhaps some unused, unchanged precursor (which experts hold is neither an adulterant nor dilutant). See, e.g., *McGlothlin,* supra, at 857; *Engelking,* supra, at 214–215; *Farris,* supra, at 580. It appears that the final product is "wet"

3. For example, we are given to understand that phenylacetic acid is an ingredient used to make phenylacetone, which in turn is a direct precursor to amphetamine and methamphetamine. See *Thompson v. State,* 885 S.W.2d 136, 137 (Tex.Cr.App. Nos. 1153–90 and 1154–90, delivered this day). Indeed, listed as a controlled substance is "Phenylacetone [when possessed with methylamine with intent to manufacture methamphetamine]." Act 1983, Schedule II, § 2.04(d); Penalty Group 1, § 4.02(b)(8). In Act 1985, however, it is listed alone in Schedule II, § 2.04(f)(2); Penalty Group 2, § 4.02(c)(2). See now V.T.C.A. Texas Health & Safety Code, Schedule II, § 481.033(5); Penalty Group 2, § 481.103(a)(2).

4. As matter of fact the indictment in this cause alleged, *inter alia* that appellant did then and there intentionally and knowingly "manufacture and *possess with intent to manufacture* and deliver more than 400 grams of a controlled substance, to-wit Amphetamine." Granted it did not allege possession of "phenylacetone" as an "immediate precursor," and given the facts of this case, one is left to wonder just how the grand jury expected the prosecution to prove that appellant possessed *amphetamine* "with intent to manufacture" *amphetamine.* Notably, the trial court did not authorize the jury to convict on that theory. See majority opinion, at 107. Had it been alleged, however, the State might well have secured a conviction for possession of phenylacetone with intent to manufacture amphetamine with equally serious punishment, depending, of course, on the amount of phenylacetone.

amphetamine that still must "dry out" to become a powdery substance. See *Reeves, supra,* at 541.

In the course of that *completed* process, then, an "immediate precursor" loses its separate identity in forming the whole of the manufactured controlled substance. Thus its "weight" has been incorporated into and becomes an inseparable part of the final product. In that circumstance, therefore, there is no basis for alleging the separate weight of any such precursor for it has been "used up" in the manufacturing process.[5]

Also implicated is a "criminal classification," i.e., § 4.02(d)(1)(A); unlike the opinion below and of the majority, Part III, at 108–109, I do not see it as a viable theory of prosecution.[6]

While I agree the evidence is insufficient, for reasons given *ante* I cannot accept the rationale in Part II of the majority opinion, and its consequences mentioned elsewhere; nor am I persuaded that the "material, compound, mixture or preparation" theory developed in Part III is tenable under the Act, much less applicable under the facts of this cause showing the manufacturing process was aborted long before there was any final product.[7] Thus I concur only in the judgment of the Court.

However, § 4.02 merely sets up *"criminal classifications"* of controlled substances, without defining offenses or fixing punishments; whereas only §§ 4.03–4.043 prescribe respective offenses and attached penalties in terms of "aggregate weight [of the controlled substance itself], including any adulterants or dilutants." Compare V.T.C.A. Texas Health & Safety Code, § 481.101, 481.102–481.105 and §§ 481.112–481.118. Thus portions of "material, compound, mixture or preparation" are not figured in "aggravated weight" of the *final product* unless they are proven to be "adulterants or dilutants" introduced during the process of manufacture or added thereafter to "cut" it. *McGlothlin,* supra, note 8, and related text at 860–861 (no evidence that water was intended "to increase the bulk or quantity of the final product"); *Engelking,* supra, at 216; *Reeves,* supra, at 544; *Farris,* supra, at 580; see also *Cawthon,* supra, 849 S.W.2d at 347; cf. *Blackmon v. State,* 786 S.W.2d 467, at 470–473 (Tex.App.—Houston [1st] 1990), PDR refused) (crushed granulated sugar used to "cut" methamphetamine to increase bulk).

Thus a defined offense is related to a "penalty group" merely to identify the classification of the particular controlled substance for purposes of assessing punishment—that which is prescribed in the same section defining the offense, according to its aggregate weight. The aggregate weight of any material, compound, mixture, or preparation containing any quantity of a listed controlled substance, here amphetamine, is the combined weights of the manufactured substance and adulterants or dilutants whether retained in or later added to "cut" the final product. §§ 1.02(5) and (29)(F); 4.02(d)(1)(A); 4.032(a) and (b), or (c) and (d); 4.042(a) and (b), or (c) and (d).

---

**5.** The majority comes to the same conclusion, opinion, at 107–108; but only upon analyzing the stated definition of "controlled substance" in the 1983 Act, § 1.02(5), *viz:* " 'Controlled substance' means a drug, substance *or* immediate precursor listed. . . ." Regardless, not only are "drug" and "immediate precursor" identified by distinct definitions, § 1.02(14) and (§ 1.02(15), but also each as well as "substance" is criminally classified separately throughout § 4.02.

On the other hand, whether an "unused" immediate precursor may be extracted in bulk from the aqueous solution or, for that matter, has not yet been included in the manufacturing process, it is still a controlled substance itself and, as pointed out *ante,* at 107, possessing it is a penal offense and may be prosecuted as such. In that event, of course, the immediate precursor must be identified in the charging instrument. Again, an "immediate precursor" is something other than an adulterant or dilutant.

**6.** Based mainly on testimony from the DPS chemist the court of appeals concluded the evidence was sufficient to prove manufacture of amphetamine over 400 grams under § 4.02(c)(3), *viz:*

"Clearly, the 704.89 grams of solution in the flask was a compound, mixture or preparation containing a quantity of amphetamine. Contrary to the rationale of *McGlothlin* that Penalty Groups 1 and 2 include *only* the prohibited controlled substance, Section 4.02(c)(3) clearly states that as to amphetamine, not only the prohibited controlled substance, but also '[a]ny material, compound, mixture, or preparation which contains any quantity' of amphetamine is included in Penalty Groups 2. Cf. *McGlothlin* at 860–861."

Slip opinion, at 3 (emphasis in original).

Alas, the court of appeals overlooked that *McGlothlin* was decided under the Act extant in 1983, when amphetamine was in Penalty Group 3. See note 1, *ante.* Nonetheless, then § 4.02(d)(1) also included "(A) Amphetamine" under "Any material, compound, mixture, or preparation" *et cetera.*

**7.** From a "common 'manufacturing' scenario," *ante,* 106, n. 1, many foregoing cases indicate that practitioners are having difficulty analyzing operative facts to determine the appropriate aggravated offense denounced by the Texas Controlled Substances Act. Charging instruments

MILLER, Judge, concurring.

Before joining the majority opinion I want to reiterate some of the observations I made in *Reeves v. State*, 806 S.W.2d 540 (Tex.Crim. App.1990). For the convenience of the reader I will lay out in footnote the germane comments I made in *Reeves* [1].

Although the Controlled Substances Act quoted in *Reeves* has been recodified in the 1992 Health and Safety Code as Sections 481.103, 481.113 and 481.116, as well as 481.002 (Penalty Group 2; Offense: Manufacture or Delivery of Substance in Penalty Group 2; Offense: Possession of Substance in Penalty Group 2; and Definitions, respectively. See Appendix.), those sections are in all material respects the same as the old sections of the Controlled Substances Act, and thus the observations made today will pertain to current law.

As alluded to in Footnote 5 of *Reeves*, supra, (see footnote 1 herein) there is a reconciliation necessary between the "material, compound, mixture, or preparation that contains any quantity of [a substance listed in (3)] of Section 481.103" and the "adulterants or dilutants" language contained in Secs. 481.113 and 481.116. This is true because a controlled substance that is mixed with adulterants and dilutants is per se a material, compound, mixture, or preparation that contains "any quantity" of the controlled substance. So if the State alleges "mixture", etc. in the indictment (and mixture of course includes adulterants or dilutants), in proving mixture have they not removed for themselves the burden of proving adulterants or dilutants? Preliminarily, I would answer the

---

allege criminal conduct pertaining to amphetamine ranging from simple "possession," "possession with intent to manufacture" to actual "manufacture," yet both prosecution and defense overlook that the facts reveal no more than suspects in or around a "lab" engaged in the process of "manufacturing" what is expected will turn out to be, but as the chemist here explained is not, a product "ready for distribution as amphetamine." In short, there is no "manufactured" amphetamine in the "cooking" flask.

However, since Acts 1981, 67th Leg., Ch. 268, p. 697, § 2, the Legislature has provided a proper way to deal with that situation, *viz:*

"The provisions of Title 4, Penal Code, apply to ... offenses designated as aggravated offenses under subchapter 4 of this section, except that the punishment for a preparatory offense is the same as the punishment prescribed for the offense that was the object of the preparatory offense."

Former § 4.011; now Health and Safety Code, § 481.108; cf. *Baxter v. State*, 718 S.W.2d 28, at 31–32 (Tex.App.—Eastland 1986) PDR refused (attempted aggravated manufacture of methamphetamine).

1. Although neither appellant nor the State raises the point in their arguments, we are aware that the manufacture or delivery of the controlled substance "amphetamine" in particular poses additional considerations because of the way in which amphetamine is listed in the Controlled Substances Act. Section 1.02(4) defines "controlled substance" as "a drug, substance, or immediate precursor listed in Schedules I through V or Penalty Groups 1 through 4 of this Act." Section 4.02(c) covers Penalty Group 2 controlled substances and lists as prohibited "... *a material, compound, mixture, or preparation which contains any quantity of the following sub-*

stances having a potential for abuse associated with a depressant or stimulant effect on the central nervous system: *Amphetamine, its salts, optical isomers, and salts of optical isomers; ..."* Section 4.02(c) (emphasis added).

From the wording of this provision, the "controlled substance" prohibited may be: a) a material, compound, mixture, or preparation which contains any amount of a listed substance (e.g., amphetamine); or b) the listed substance in its "pure" form, since a "material" could consist of 100 percent of the listed substance. The distinction becomes important when the State seeks conviction for an aggravated offense under Sec. 4.031(c).

Where a material, compound, mixture, or preparation contains some quantity of a listed controlled substance, e.g., amphetamine, the "controlled substance" is that material, according to the statute. Section 4.02(c)(3). In that case, if the weight of the material is over 28 grams, then the aggravating element of Sec. 4.031(c) is met. On the other hand, the State may seek conviction under Sec. 4.031(c) for possessing, manufacturing, or delivering the "pure" substance, e.g., "pure" amphetamine. In that case, as we discussed previously, the State must prove either that the amount of the pure amphetamine weighs more than 28 grams or that the amount of pure amphetamine, plus any adulterants or dilutants, if proven to exist, weighs more than 28 grams.

The evidence in this case did show that appellant delivered a "material, compound, mixture, or preparation" containing some amount of amphetamine, and that the material weighed more than 28 grams. However, the charge to the jury did not allow a conviction under that theory, nor was appellant ever indicted under such an allegation. *Reeves*, 806 S.W.2d at 545, fn. 5.

question in the affirmative. I say that because the "adulterants or dilutants" language of Secs. 481.113 and 481.116 refers to the entirety of Section 481.103 which includes numerous substances. By comparison, the "material, compound, mixture, or preparation" language in (3) of that section only pertains to seven substances. A very logical reading of all of these sections together leads to the conclusion that as to the seven substances listed in (3), the legislature intended the any "mixture" language to control and further intended that the "adulterants or dilutants" language control all of the other substances listed. This reading gives effect to both the "adulterants or dilutants" language and the "material, compound, mixture, or preparation" language in the respective sections.

Of course, my musing in footnote 5 of *Reeves* was dicta, just as I'm sure the musings in this concurring opinion will be so construed. But at least we are moving forward to the time when the issue will be joined and the full Court will be asked to reconcile the "adulterants or dilutants" language with the "material, compound, mixture, or preparation" language. Doubtless, this will come as the State begins using the latter language in charging instruments.

With these observations I join the opinion of the Court.

APPENDIX

§ 481.103. Penalty Group 2

(a) Penalty Group 2 consists of:

(1) any quantity of the following hallucinogenic substances, their salts, isomers, and salts of isomers, unless specifically excepted, if the existence of these salts, isomers, and salts of isomers is possible within the specific chemical designation:

4–bromo–2, 5–dimethoxyamphetamine (some trade or other names: 4–bromo–2, 5–dimethoxy–alpha–methylphenethylamine; 4–bromo–2, 5–DMA);

Bufotenine (some trade and other names: 3–(beta– Dimethylaminoethyl)–5–hydroxyindole; 3–(2–dimethylaminoethyl)–5– indolol; N, N–dimethylserotonin; 5–hydroxy–N, N–dimethyltryptamine; mappine);

Diethyltryptamine (some trade and other names: N, N–Diethyltryptamine, DET);

2, 5–dimethoxyamphetamine (some trade or other names: 2, 5–dimethoxy–alpha–methylphenethylamine; 2, 5–DMA);

Dimethyltryptamine (some trade and other names: DMT);

Dronabinol (synthetic) in sesame oil and encapsulated in a soft gelatin capsule in a U.S. Food and Drug Administration approved drug product (some trade or other names for Dronabinol: (a6aR–trans)–6a,7,8,10a–tetrahydro– 6,6,9–trimethyl–3–pentyl–6H– dibenzo [b,d]pyran–1–ol or (-)–delta–9–(trans)–tetrahydrocannabinol);

Ethylamine Analog of Phencyclidine (some trade or other names: N–ethyl–1–phenylcyclohexylamine, (1–phenylcyclohexyl) ethylamine, N–(1–phenylcyclohexyl) ethylamine, cyclohexamine, PCE);

Ibogaine (some trade or other names: 7–Ethyl–6, 6, beta 7, 8, 9, 10, 12, 13–octahydro–2–methoxy–6, 9–methano–5H–pyrido [1′, 2′:1, 2] azepino [5, 4–b] indole; tabernanthe iboga.);

Mescaline;

5–methoxy–3, 4–methylenedioxy amphetamine;

4–methoxyamphetamine (some trade or other names: 4–methoxy–alpha–methylphenethylamine; paramethoxyamphetamine; PMA);

1–methyl– 4–phenyl–4–propionoxypiperidine (MPPP, PPMP);

4–methyl–2, 5–dimethoxyamphetamine (some trade and other names: 4–methyl–2, 5–dimethoxy–alpha–methylphenethylamine; "DOM"; "STP");

3,4–methylenedioxy methamphetamine (MDMA, MDM);

3,4–methylenedioxy amphetamine;

3,4–methylenedioxy N–ethylamphetamine (Also known as N–ethyl MDA);

Nabilone (Another name for nabilone: (+)–trans–3–(1,1–dimethylheptyl)–6,6a,7,8,10,10a–hexahydro–1–   hydroxy–6,6–dimethyl–9H–dibenzo[b,d]pyran–9–one;

N–ethyl–3–piperidyl benzilate;

N–hydroxy–3,4–methylenedioxyamphetamine (Also known as N–hydroxy MDA);

4–methylaminorex;

N–methyl–3–piperidyl benzilate;

Parahexyl (some trade or other names: 3–Hexyl–1–hydroxy–7, 8, 9, 10–tetrahydro–6, 6, 9–trimethyl–6H–dibenzo [b, d] pyran; Synhexyl);

1–Phenylcyclohexylamine;

1–Piperidinocyclohexanecarbonitrile (PCC);

Psilocin;

Psilocybin;

Pyrrolidine Analog of Phencyclidine (some trade or other names: 1–(1–phenylcyclohexyl)–pyrrolidine, PCPy, PHP);

Tetrahydrocannabinols, other than marihuana, and synthetic equivalents of the substances contained in the plant, or in the resinous extractives of Cannabis, or synthetic substances, derivatives, and their isomers with similar chemical structure and pharmacological activity such as:

delta–1 cis or trans tetrahydrocannabinol, and their optical isomers;

delta–6 cis or trans tetrahydrocannabinol, and their optical isomers;

delta–3, 4 cis or trans tetrahydrocannabinol, and its optical isomers;

compounds of these structures, regardless of numerical designation of atomic positions, since nomenclature of these substances is not internationally standardized;

Thiophene Analog of Phencyclidine (some trade or other names: 1–[1–(2–thienyl) cyclohexyl] piperidine; 2–Thienyl Analog of Phencyclidine; TPCP, TCP);

1–[1–(2–thienyl)cyclohexyl]pyrrolidine (some trade or other names: TCPy); and

3,4,5–trimethoxy amphetamine;

(2) Phenylacetone (some trade or other names: Phenyl–2–propanone; P–2–P, Benzymethyl ketone, methyl benzyl ketone); and

(3) unless specifically excepted or unless listed in another Penalty Group, a material, compound, mixture, or preparation that contains any quantity of the following substances having a potential for abuse associated with a depressant or stimulant effect on the central nervous system:

Amphetamine, its salts, optical isomers, and salts of optical isomers;

Etorphine Hydrochloride;

Fenethylline and its salts;

Mecloqualone and its salts;

Methaqualone and its salts;

N–Ethylamphetamine, its salts, optical isomers, and salts of optical isomers; and

N,N–dimethylamphetamine (some trade or other names: N,N,alpha–trimethylbenzeneethaneamine; N,N,alpha–trimethylphenethylamine), its salts, optical isomers, and salts of optical isomers.

(b) For the purposes of Subsection (a)(1) only, the term "isomer" includes an optical, position, or geometric isomer.

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989. Amended by Acts 1989, 71st Leg., ch. 1100, § 5.02(n), eff. Sept. 1, 1989; Acts 1991, 72nd Leg., ch. 761, § 2, eff. Sept. 1, 1991.

**Historical and Statutory Notes**

The 1989 amendment, to conform to Acts 1989, 71st Leg., ch. 776, § 21, in subsec. (a), subd. (1) inserted "3,4-methylenedioxy N-ethylamphetamine (Also known as N-ethyl MDA);" and "N-hydroxy-3, 4-methylenedioxyamphetamine (Also known as N-hydroxy MDA); 4-methylaminorex;".

The 1991 amendment, in subd. (a)(1), substituted "(a6aR-trans)-6a,7,8,10a-tetrahydro-6,6,9-trimethyl-3-pentyl-6H- dibenzo[b,d]pyran-1-ol" for "(a6aR-trans)-6a,7,8,10a-tetrahydro-6,6,9-trimethyl-3-pentyl-6H-dibenzo[b,d]pyran-1-ol"; "1-methyl-4-phenyl-4-propionoxypiperidine (MPPP, PPMP)" for "1-methyl-4-phenyl-1,2,5,6-tetrahydro-pyridine (MPTP); 1-methyl-4-phenyl-4-propionoxy-piperidine (MPPP, PPMP)"; "3,4-methylenedioxy methamphetamine (MDMA, MDM)" for "3,4-methylenedioxy methamphetamine (MDMA, MDM)"; inserted the reference to "Nabilone"; substituted "1-Piperidinocyclohexanecarbonitrile (PCC)" for "1-Piperidinocyclohexane-Carbonitrile (PCC)"; inserted the reference to "1-[1-(2-thienyl)cyclohexyl]pyrrolidine"; and in subd. (a)(3), added the reference to "N,N-dimethylamphetamine".

**Prior Laws**

Acts 1905, 29th Leg., p. 45.
Acts 1919, 36th Leg., pp. 277, 278.
Acts 1919, 36th Leg., 2nd C.S., p. 156.
Acts 1931, 42nd Leg., p. 154, ch. 97.

Acts 1933, 43rd Leg., p. 609, ch. 204.
Vernon's Ann.P.C. (1925) arts. 720 to 725d, 725f.
Acts 1937, 45th Leg., p. 333, ch. 169.
Acts 1941, 47th Leg., p. 647, ch. 392, §§ 1, 2.
Acts 1943, 48th Leg., p. 346, ch. 225, § 1.
Acts 1943, 48th Leg., p. 703, ch. 391.
Acts 1953, 53rd Leg., p. 594, ch. 237.
Acts 1953, 53rd Leg., p. 812, ch. 328, §§ 1 to 7.
Acts 1954, 53rd Leg., 1st C.S., p. 103, ch. 50, § 1.
Acts 1955, 54th Leg., p. 810, ch. 300.
Acts 1955, 54th Leg., p. 903, ch. 354, § 1.
Acts 1955, 54th Leg., p. 1026, ch. 385, § 1.
Acts 1955, 54th Leg., p. 1027, ch. 386, § 1.
Acts 1955, 54th Leg., p. 1215, ch. 486, § 1.
Acts 1957, 55th Leg., p. 215, ch. 101, § 1.
Acts 1961, 57th Leg., p. 310, ch. 161, § 1.
Acts 1961, 57th Leg., p. 315, ch. 167, § 1.
Acts 1963, 58th Leg., p. 570, ch. 206, §§ 1, 2.
Acts 1969, 61st Leg., p. 703, ch. 242, § 1.
Acts 1971, 62nd Leg., p. 816, ch. 87.
Acts 1971, 62nd Leg., p. 2805, ch. 908, §§ 1 to 4.
Acts 1971, 62nd Leg., p. 2913, ch. 963, §§ 1, 2.
Acts 1971, 62nd Leg., p. 3069, ch. 1023, §§ 1 to 4.
Acts 1973, 63rd Leg., p. 995, ch. 399, § 5.
Acts 1973, 63rd Leg., p. 1132, ch. 429.
Acts 1979, 66th Leg., p. 1286, ch. 598, § 6.
Acts 1985, 69th Leg., ch. 227, § 8.
Acts 1987, 70th Leg., ch. 666, § 3.

**Notes of Decisions**

Tetrahydrocannabinol, generally 1

**1. Tetrahydrocannabinol, generally**

Section listing "Tetrahydrocannabinols other than marijuana and synthetic equivalents" was intended to exclude only marijuana and does not exclude any other substance contained in marijuana or the resinous extractives of cannabis or similar synthetic substances, including synthetic tetrahydrocannabinols, and does not exclude hashish. Ex parte Psaroudis (Cr.App.1974) 508 S.W.2d 390.

In view of federal statute defining marijuana (21 U.S.C.A. § 802) and listing it separate and apart from tetrahydrocannabinols, Congress intended that latter should mean and include only synthetic THC, and that marijuana would include everything containing organic THC, including hashish. Few v. State (Cr.App.1979) 588 S.W.2d 578.

In state's controlled substances law, any material, compound, mixture or preparation which contains any amount of the hallucinogenic substance tetrahydrocannabinol, other than in marijuana, is within contemplation of penalty group 2, and thus any preparation that contains organic resin extracted from plant or synthetic THC in whatever form and under whatever name is embraced. Few v. State (Cr.App.1979) 588 S.W.2d 578.

## § 481.113. Offense: Manufacture or Delivery of Substance in Penalty Group 2

(a) Except as authorized by this chapter, a person commits an offense if the person knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver a controlled substance listed in Penalty Group 2.

(b) An offense under Subsection (a) is a felony of the second degree if the amount of the controlled substance to which the offense applies is, by aggregate weight, including adulterants or dilutants, less than 28 grams.

(c) A person commits an aggravated offense if the person commits an offense under Subsection (a) and the amount of the controlled substance to which the

offense applies is, by aggregate weight, including adulterants or dilutants, 28 grams or more.

(d) An offense under Subsection (c) is:

(1) punishable by confinement in the Texas Department of Corrections [1] for life or for a term of not more than 99 years or less than 5 years, and a fine not to exceed $50,000, if the amount of the controlled substance to which the offense applies is, by aggregate weight, including adulterants or dilutants, 28 grams or more but less than 400 grams; and

(2) punishable by confinement in the Texas Department of Corrections for life or for a term of not more than 99 years or less than 10 years, and a fine not to exceed $100,000, if the amount of the controlled substance to which the offense applies is, by aggregate weight, including adulterants or dilutants, 400 grams or more.

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989.

1. References to the Texas Department of Corrections shall mean the institutional division of the Texas Department of Criminal Justice by Acts 1989, 71st Leg., ch. 785, § 1.19(f).

### Historical and Statutory Notes

**Prior Laws:**

Acts 1905, 29th Leg., p. 45.
Acts 1919, 36th Leg., pp. 277, 278.
Acts 1919, 36th Leg., 2nd C.S., p. 156.
Acts 1931, 42nd Leg., p. 154, ch. 97.
Acts 1933, 43rd Leg., p. 609, ch. 204.
Vernon's Ann.P.C. (1925) arts. 720 to 725d, 725f.
Acts 1937, 45th Leg., p. 333, ch. 169.
Acts 1941, 47th Leg., p. 647, ch. 392, §§ 1, 2.
Acts 1943, 48th Leg., p. 346, ch. 225, § 1.
Acts 1943, 48th Leg., p. 703, ch. 391.
Acts 1953, 53rd Leg., p. 594, ch. 237.
Acts 1953, 53rd Leg., p. 812, ch. 328, §§ 1 to 7.
Acts 1954, 53rd Leg., 1st C.S., p. 103, ch. 50, § 1.
Acts 1955, 54th Leg., p. 810, ch. 300.
Acts 1955, 54th Leg., p. 903, ch. 354, § 1.
Acts 1955, 54th Leg., p. 1026, ch. 385, § 1.
Acts 1955, 54th Leg., p. 1027, ch. 386, § 1.

Acts 1955, 54th Leg., p. 1215, ch. 486, § 1.
Acts 1957, 55th Leg., p. 215, ch. 101, § 1.
Acts 1961, 57th Leg., p. 310, ch. 161, § 1.
Acts 1961, 57th Leg., p. 315, ch. 167, § 1.
Acts 1963, 58th Leg., p. 570, ch. 206, §§ 1, 2.
Acts 1969, 61st Leg., p. 703, ch. 242, § 1.
Acts 1971, 62nd Leg., p. 816, ch. 87.
Acts 1971, 62nd Leg., p. 2805, ch. 908, §§ 1 to 4.
Acts 1971, 62nd Leg., p. 2913, ch. 963, §§ 1, 2.
Acts 1971, 62nd Leg., p. 3069, ch. 1023, §§ 1 to 4.
Acts 1973, 63rd Leg., p. 995, ch. 399, § 5.
Acts 1973, 63rd Leg., p. 1132, ch. 429.
Acts 1981, 67th Leg., p. 698, ch. 268, § 4.
Acts 1983, 68th Leg., p. 2375, ch. 425, § 7.
Vernon's Ann.Civ.St. arts. 4413(37); 4476–15, § 4.031.

### Cross References

Controlled substance analogue, manufacture, delivery or possession, see § 481.123.
Exemptions for use in federally approved therapeutic research program, see § 481.111.
Expenditure or investment of funds, see § 481.126.
Punishment, second-degree felony, see V.T.C.A. Penal Code, § 12.33.
Repeat offenders, punishment, see § 481.107.

### Notes of Decisions

Instructions 4
Manufacture, sufficiency of evidence 2
Possession with intent to deliver, sufficiency of evidence 3
Quantity 1
Sufficiency of evidence 2–3
    Manufacture 2
    Possession with intent to deliver 3

---

**1. Quantity**

Amount of controlled substance delivered need not be proved to sustain conviction for lowest punishment class applicable to substance. Stockton v. State (App. 3 Dist.1988) 756 S.W.2d 873.

Entire 220.18 grams of amphetamine sold to undercover officer could be considered in determining whether State proved drug weight of more than 200 but less than 400 grams in prosecution for aggravated delivery of controlled substance, where transaction involved sale on wholesale level of finished product ready to be cut for sale at retail level, even though 24% of weight of substance consisted of by-products of manufacturing process. Herndon v. State (App. 2 Dist.1989) 767 S.W.2d 510, review refused.

Where State attempts to obtain conviction for aggravated offense under theory that aggregate weight of controlled substance sold by defendant, including adulterants or dilutants, is over 28 grams, State first must prove existence of any adulterants and dilutants, and then must show that controlled substance, plus any adulterants or dilutants, if proven to exist, weighs more than 28 grams. Reeves v. State (Cr.App.1990) 806 S.W.2d 540, rehearing on petition for discretionary review denied, certiorari denied 111 S.Ct. 1641, 113 L.Ed.2d 736.

Conviction for delivery of more than 28 grams of amphetamine was not sufficiently supported by testimony that, while entire contents of plastic bag weighed 29.76 grams, witness had no opinion as to how much of it was amphetamine, and no other evidence as to identity of other substances in bag; though statute allowed conviction where aggregate weight of controlled substance, including adulterants or dilutants, was over 28 grams, there was no evidence that any nonamphetamine substance in bag was adulterant or dilutant, intended to increase bulk or quantity of product. Reeves v. State (Cr.App. 1990) 806 S.W.2d 540, rehearing on petition for discretionary review denied.

Evidence was not sufficient to support defendant's conviction for possession of more than 400 grams of pure amphetamine, where pertinent application paragraph of charge would allow any rational trier of fact to conclude that in determining amount of pure amphetamine he could add "adulterants and dilutants," and term "controlled substance" in statutory definition did not include adulterants and dilutants. Farris v. State (Cr.App.1990) 811 S.W.2d 577, rehearing on petition for discretionary review denied.

**2. Sufficiency of evidence—Manufacture**

Evidence that a laboratory in process of manufacturing amphetamine was found operating on property less than 200 yards from residence which defendant shared with his wife, that large quantities of amphetamine were found inside residence, and that defendant had on his person handwritten notes which employed a chemical formula for manufacturing amphetamine and addresses of two chemical laboratory supply companies was sufficient to connect defendant to illegal manufacture of a controlled substance notwithstanding that legal title to property was in name of defendant's wife. Pinkston v. State (App. 2 Dist.1984) 681 S.W.2d 893, review refused.

## § 481.116. Offense: Possession of Substance in Penalty Group 2

(a) Except as authorized by this chapter, a person commits an offense if the person knowingly or intentionally possesses a controlled substance listed in Penalty Group 2, unless the person obtained the substance directly from or under a valid prescription or order of a practitioner acting in the course of professional practice.

(b) An offense under Subsection (a) is a felony of the third degree if the amount of the controlled substance possessed is, by aggregate weight, including adulterants or dilutants, less than 28 grams.

(c) A person commits an aggravated offense if the person commits an offense under Subsection (a) and the amount of the controlled substance possessed is, by aggregate weight, including adulterants or dilutants, 28 grams or more.

(d) An offense under Subsection (c) is:

(1) punishable by confinement in the Texas Department of Corrections [1] for life or for a term of not more than 99 years or less than 5 years, and a fine not to exceed $50,000, if the amount of the controlled substance possessed is, by aggregate weight, including adulterants or dilutants, 28 grams or more but less than 400 grams; and

(2) punishable by confinement in the Texas Department of Corrections for life or for a term of not more than 99 years or less than 10 years, and a fine not to exceed $100,000, if the amount of the controlled substance possessed is, by aggregate weight, including adulterants or dilutants, 400 grams or more.

Acts 1989, 71st Leg., ch. 678, § 1, eff. Sept. 1, 1989.

1. References to the Texas Department of Corrections shall mean the institutional division of the Texas Department of Criminal Justice by Acts 1989, 71st Leg., ch. 785, § 1.19(f).

### Historical and Statutory Notes

**Prior Laws:**

Acts 1905, 29th Leg., p. 45.
Acts 1919, 36th Leg., pp. 277, 278.
Acts 1919, 36th Leg., 2nd C.S., p. 156.
Acts 1931, 42nd Leg., p. 154, ch. 97.
Acts 1933, 43rd Leg., p. 609, ch. 204.
Vernon's Ann.P.C. (1925) arts. 720 to 725d, 725f.
Acts 1937, 45th Leg., p. 333, ch. 169.
Acts 1941, 47th Leg., p. 647, ch. 392, §§ 1, 2.
Acts 1943, 48th Leg., p. 346, ch. 225, § 1.
Acts 1943, 48th Leg., p. 703, ch. 391.
Acts 1953, 53rd Leg., p. 594, ch. 237.
Acts 1953, 53rd Leg., p. 812, ch. 328, §§ 1 to 7.

Acts 1954, 53rd Leg., 1st C.S., p. 103, ch. 50, § 1.
Acts 1955, 54th Leg., p. 810, ch. 300.
Acts 1955, 54th Leg., p. 903, ch. 354, § 1.
Acts 1955, 54th Leg., p. 1026, ch. 385, § 1.
Acts 1955, 54th Leg., p. 1027, ch. 386, § 1.
Acts 1955, 54th Leg., p. 1215, ch. 486, § 1.
Acts 1957, 55th Leg., p. 215, ch. 101, § 1.
Acts 1961, 57th Leg., p. 310, ch. 161, § 1.
Acts 1961, 57th Leg., p. 315, ch. 167, § 1.
Acts 1963, 58th Leg., p. 570, ch. 206, §§ 1, 2.
Acts 1969, 61st Leg., p. 703, ch. 242, § 1.
Acts 1971, 62nd Leg., p. 816, ch. 87.
Acts 1971, 62nd Leg., p. 2805, ch. 908, §§ 1 to 4.

Acts 1971, 62nd Leg., p. 2913, ch. 963, §§ 1, 2.
Acts 1971, 62nd Leg., p. 3069, ch. 1023, §§ 1 to 4.
Acts 1973, 63rd Leg., p. 995, ch. 399, § 5.
Acts 1973, 63rd Leg., p. 1132, ch. 429.

Acts 1981, 67th Leg., p. 700, ch. 268, § 6.
Acts 1983, 68th Leg., p. 2381, ch. 425, § 10.
Vernon's Ann.Civ.St. arts. 4413(37); 4476–15, § 4.041.

## Cross References

Controlled substance analogue, possession, see § 481.123.
Exemptions for use in federally approved therapeutic research program, see § 481.111.
Expenditure or investment of funds, see § 481.126.
Punishment, third-degree felony, see V.T.C.A. Penal Code, § 12.34.
Repeat offenders, punishment, see § 481.107.

## Notes of Decisions

Affirmative link to defendant 2
Control and knowledge 1
Indictment and information 3
Sentence and punishment 5
Sufficiency of evidence 4

---

**1. Control and knowledge**

State failed to show that defendant exercised care, control and management over amphetamine found in laundry hamper in bathroom off master bedroom that defendant occupied with male roommate, as was required to convict defendant of possessing amphetamine; possibility that roommate put amphetamine in hamper was reasonably consistent with all evidence upon which State relied to prove its circumstantial case. McCarty v. State (App. 2 Dist.1990) 788 S.W.2d 213, review dismissed 820 S.W.2d 795.

**2. Affirmative link to defendant**

Although accused was merely a passenger in nonowned automobile, in trunk of which police found four containers of amphetamine, accused was sufficiently linked with the contraband so as to warrant conviction on possession offense where odor of amphetamines solution emanating from the vehicle and occupants was strong enough for accused to be aware of its presence, there was no lock on the trunk and access thereto was gained by use of screwdriver, jacket found nearest accused contained drug paraphernalia, accused was apparently intoxicated by use of a substance other than an alcohol beverage and accused had a past record of dealing with controlled substances. Durham v. State (App. 2 Dist.1986) 701 S.W.2d 951, review refused.

Smell of ether that permeated driver's vehicle and clothing, along with driver's ducking down in vicinity of drug when confronted by officer, were sufficient affirmative links to sustain driver's conviction of possession of less than 28 grams of amphetamine, found underneath driver's seat of automobile. Soto v. State (App. 2 Dist.1991) 810 S.W.2d 861, review refused.

**3. Indictment and information**

Information charging defendant with unlawful possession of amphetamine was not defective because it failed to allege that amphetamine was not a preparation for use in the nose and unfit for internal use. Meadowes v. State (Cr.App.1963) 368 S.W.2d 203.

Where drug methaqualone was not named as dangerous drug under then effective statute, nor did indictment allege any facts showing why methaqualone was in fact a dangerous drug, indictment under which defendant was convicted of unlawfully possessing a dangerous drug was void and, since trial court did not have jurisdiction, such judgment was subject to collateral attack. Ex parte Howeth (Cr.App.1980) 609 S.W.2d 540.

Variance between allegation in the purport clause that petitioner had unlawfully acquired a controlled substance, namely Amphetamine and the tenor clause showing that the forged prescription was for Biphetamine did not cause the indictment to be fundamentally defective. Ex parte Holbrook (Cr.App.1980) 609 S.W.2d 541.

Indictment charging that petitioner fraudulently attempted to obtain possession of Preludin, which was not expressly listed in schedules and penalty groups of Controlled Substances Act, was fundamentally defective for reason that indictment failed to allege facts which needed to be proved about Preludin which made it a controlled substance. Id.

Indictment, in language of Controlled Substances Act, specifying "amphetamine" as the controlled substance possessed is sufficient to include isomers and salts and is not subject to being quashed for failure to apprise the accused of the type of substances possessed. Durham v. State (App. 2 Dist.1986) 701 S.W.2d 951, review refused.

WHITE, Judge, dissenting.

For the reasons I set out in my majority opinion on original submission, *Dowling v. State*, No. 107–89 (Tex.Cr.App., March 27, 1991), I respectfully dissent to the majority's decision to reverse the judgment of the trial court and render an acquittal for appellant.

I believe the majority opinion overlooks the unique nature of the statute which proscribes the manufacture of amphetamine, TEX.REV.CIV.STAT.ANN. Art. 4476.15, § 4.031 (repealed). As I stated on original submission, "The (Controlled Substances) Act shows a clear legislative intent to punish a person for possession of the pure form of amphetamine. There is also a clear intent to prohibit the possession of "any material, compound, mixture, or preparation" containing the amphetamine.... The language of the Act clearly intends for the substances in which the amphetamine is discovered to be

counted towards the weight of the controlled substance by the use of the words "any material, compound, mixture, or preparation which contains any quantity of ... amphetamine." Art. 4476.15 § 2.04(e) (repealed).

In the majority's rush to reverse and acquit appellant, they have imposed an unrealistic and impractical requirement upon the State to prove, separately, the individual weights of both the controlled substance and the adulterants and dilutants, or the immediate precursors. As I stated also on original submission, the Controlled Substances Act was written so that

"The relevant weight for calculating the punishment should include the medium in which the amphetamine is found. The relevant weight is that of *"any* material, compound, *mixture,* or preparation which contains *any quantity* of the ... amphetamine." Sec. 2.04(e), supra. The language cannot be reasonably construed as referring to anything other than the weight of both the controlled substance and the mixture or substance in which it is found. It is not possible to construe the language of the Controlled Substances Act to make the penalty turn on the net weight of the drug rather than the gross weight of the drug and the mixture in which it is found." (emphasis applied in original).

See also Art. 4476.15 § 4.031(a), (c), and (d).

"The clear language of § 4.031 shows the intent of the Legislature to include substances not yet ready for street sales, i.e., "... the amount of the controlled substance ... with intent to manufacture." Furthermore, "by aggregate weight" is by definition the entire quantity of something.... In the instant case, this Court is not dealing with a final product and a possession conviction, but instead, the seized liquid was still in the manufacturing process and the conviction is for manufacturing a controlled substance, namely amphetamine. Therefore, the issue is whether or not the precursor substances are to be included in the weight when assessing punishment."

For these reasons, I would hold that the evidence in the instant case was sufficient to prove appellant manufactured over 400 grams of amphetamine as alleged in the indictment. I dissent to the majority's decision to decide otherwise.

McCORMICK, P.J., joins this dissent.

*OPINION ON REHEARING ON COURT'S MOTION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW*

[Filed June 29, 1994]

MILLER, Judge.

Appellant was charged in three separate counts with having illegally manufactured a controlled substance, to wit: Amphetamine.[1] The trial court instructed the jury to convict Appellant if it found that Appellant had intentionally and knowingly manufactured amphetamine, by aggregate weight, including any adulterants and dilutants, of more than 400 grams. The jury so found and Appellant was convicted of aggravated manufacturing of amphetamine.

While the Court of Appeals acknowledged that just 76.20 grams of "amphetamine base" were present, it found the evidence sufficient "to prove manufacture of amphetamine over 400 grams" because it believed that "the 704.89 grams of solution in the flask was a compound, mixture or preparation containing a quantity of amphetamine" within contemplation of Article 4476–15, 4.02(d)(3), R.C.S. *Dowling v. State* (Tex.App.—Waco, No. 10–88–099–CR, delivered November 17, 1989).

On original submission and on Appellant's motion for rehearing, we addressed a theory of prosecution under the Act, *viz:* that the "amount" of "any material, compound, mixture, or preparation which contains any quantity of [amphetamine]", former 4.02(d)(1)(A), may be included in determining the "aggregate weight" of the controlled substance, along with "adulterants or dilutants", under former 4.032(a), (c), and (d)(2). See and compare on motion for rehearing: ma-

---

**1.** As the crime occurred in 1983, the version of the Texas Controlled Substances Act in effect at that time is controlling in this case.

jority opinion, Part III, at 108–109; concurring opinion of Judge Miller; concurring opinion of Judge Clinton, at 112–113; see also *Reeves v. State*, 806 S.W.2d 540, at 545, n. 5 (Tex.Crim.App.1990).

To aid the Court in resolving those narrow issues before reaching its ultimate disposition of the cause, we granted rehearing on the Court's own motion and directed respective counsel to brief and then to present oral argument on the following questions in context of the applicable statutory provisions in effect in September 1983, *viz:*

> May a prosecution for manufacture of amphetamine be based on the theory that alleging the description of controlled substance containing any quantity of amphetamine under § 4.02(d)(1)(A) (Penalty Group 3), in an amount that is, by aggregate weight, more than 400 grams, properly states an aggravated offense under § 4.032(a), (c) and (d)(2)?

> In a prosecution for manufacture of amphetamine under § 4.032(a), (c) and (d)(2), may the aggregate weight alleged be proved by showing the weight of the "material, compound, mixture or preparation" containing a quantity of amphetamine base, without also showing that such matter is, or contains, identified adulterants or dilutants?

The parties having complied with the order of the Court and the cause having been submitted on briefs and oral argument, we will first provide a brief background of legislative and judicial developments, and then proceed to address the issues *seriatim.*

### I.

The Texas Controlled Substances Act was originally enacted twenty years ago. Acts 1973, 63rd Leg., Ch. 429, p. 1132 (H.B. 447), effective August 27, 1973. Section 4.02 of that Act prescribed criminal classifications in order to establish penalties for "violations of a provision of this Act" according to "penalty groups" of controlled substances. H.B. 447 at 1148.[2] Penalty Group 3, § 4.02(d)(1) lists under that description: "Any material, compound, mixture, or preparation which con-

tains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system: (1) Amphetamine ...". H.B. 447, at 1151.

Section 4.03(a) [with § 4.04(a)] defined certain offenses violative of the Act, in terms that a person "knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver [or possesses] a controlled substance listed in Penalty Groups 1, 2, 3, or 4".

Six years later, the Legislature revised the penalty groups to change the classification of certain controlled substances, and to add others, leaving amphetamine in Penalty Group 3. Acts 1979, 66th Leg., Ch. 598, p. 1278 (S.B. 322), effective August 27, 1979.

To be noted is that so far the Legislature had not taken cognizance of "adulterants and dilutants" for any purpose, nor included them as a component of any offense. The reason, of course, is that the weight of a controlled substance was irrelevant so long as it was more than a trace sufficient to be analyzed and identified. *See, e.g., Shults v. State*, 575 S.W.2d 29, 30 (Tex.Crim.App.1979); *Cantu v. State*, 546 S.W.2d 621, 622 (Tex.Crim.App. 1977). The only exceptions were made for offenses involving "limited quantities" of narcotic drugs in § 4.02(d)(6) and (e)(1). *See Benoit v. State*, 561 S.W.2d 810, 812–815 (Tex.Crim.App.1977).

In its next session, the Legislature adapted the concept of "aggravated offenses" to the Texas Controlled Substances Act, as part of "declared war on crime, especially drug related crime". Wedorf, *The War on Crime: 1981 Legislation*, 33 Tex.Tech.L.Rev. 765. It made no change in content to "criminal classification" by penalty groups, but did revamp definitions of all existing offenses previously stated in §§ 4.03 and 4.04 (see H.B. 447, *ante*) to provide punishment according to "aggregate weight, including adulterants and dilutants." Acts 1981, 67th Leg., Ch. 268, p. 696 (H.B. 730), effective September 1, 1981.

After the Austin Court of Appeals held H.B. 730 unconstitutional in *Ex Parte Crisp*,

---

**2.** Controlled substance was defined as "... a drug, substance or immediate precursor listed in Schedules I through IV and Penalty Groups 1 through 4 of this Act".

643 S.W.2d 487 (Tex.App.—Austin 1982), *judgment affirmed,* 661 S.W.2d 956 (Tex. Crim.App.1983), the Legislature revised, codified and reenacted many substantive and procedural laws previously enacted separately, including, of course, the late H.B. 730. Again, however, that legislation did not modify penalty groups. Acts 1983, 68th Leg., Ch. 425, p. 2361 (H.B. 1191), effective August 28, 1983.

Not until the next regular session did the Legislature separately add and reclassify certain substances in schedules and penalty groups, *inter alia,* moving amphetamine from Penalty Group 3, where it had been ever since first designated a controlled substance, to Penalty Group 2; and this time there was no modification of existing offenses as previously defined in H.B. 730 in 1981 and H.B. 1191 in 1983, both *supra,* directly involving manufacture, delivery and possession of controlled substances. See Acts 1985, 69th Leg. Ch. 227, p. 1102, at 1119 (S.B. 639), effective September 1, 1985 (now V.T.C.A. Health and Safety Code, § 481.103(a)(3). The legislative history of S.B. 639 indicates that the transfer of amphetamine from Penalty Group 3 to Penalty Group 2 was done in order to increase the penalty for unlawful delivery of amphetamine and its immediate precursors to equal the penalty then imposed for the manufacture of methamphetamines (then in Penalty Group 2).[3] However, the definition for this controlled substance was not altered during the transfer from one penalty group to the other.[4]

## II.

With the advent of the prosecution of aggravated drug cases, this Court has been faced with an increasing number of difficult issues related to the measure of the aggregate weight of a controlled substance. In

only two cases have we even alluded to the language at issue in this case.

In 1988, this Court, in *McGlothlin v. State,* 749 S.W.2d 856 (Tex.Crim.App.1988), grappled with the definition of "adulterant" and "dilutant", in determining whether the State had proved that the defendant had possessed more than 400 grams of amphetamines. In that opinion, we noted in dicta that Penalty Groups 1 and 2 included only the prohibited controlled substance while Penalty Groups 3 and 4 included not only "the prohibited controlled substance, but also '[a]ny material, compound, mixture, or preparation which contains any quantity of the following substances …'". *McGlothlin,* at 861. We observed that other states had statutes barring possession of *any mixture* (emphasis in original opinion) containing a controlled substance and opined that such language would have included the water in which the amphetamine had been found in the *McGlothlin* case. *Id.,* at 860. We also indicated that Texas provided a similar comprehensive "mixture" prohibition for items penalty groups 3 and 4. *Id.,* at 861. Finally, we stated that Penalty Groups 1 and 2 were limited to the controlled substance only and noted that Amphetamine was in penalty group 2.

That final statement was imprecise in that although amphetamine was, by the time *McGlothlin* was rendered, in Penalty Group 2, it still retained the comprehensive "[a]ny material, compound, mixture or preparation" language that this Court had noted was in penalty groups 3 and 4. However, since that language was not at issue in the case, we did not directly address it.

The Court did address such language, albeit in passing, in the case of *Reeves v. State,* 806 S.W.2d 540 (Tex.Crim.App.1990). Defendant Reeves had been charged with aggravated delivery of amphetamine. The evi-

---

**3.** The Revised Bill Analysis for S.B. 639 stated "The manufacture of amphetamines (penalty group 3) has increased by several hundred percent because it is basically the same as methamphetamine (penalty group 2) but with a lower penalty. Since illegal manufacturers have discovered that they can make an almost equally popular drug with less risk, the manufacture of amphetamine has skyrocketed. This bill places the substance in penalty group 2".

**4.** Under both penalty groups, the controlled substance was defined as follows:

"(1) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system:

(A) Amphetamine...."

dence at trial indicated that the defendant had given an undercover officer a bag of "wet" amphetamine. The entire contents of the bag weighed 29.76 grams and contained some amphetamine although the percentage of amphetamine in the material was not determined. On appeal, this Court held that the State had neither shown that the entire 29.76 grams was pure amphetamine nor shown that the portion which was not amphetamine fit the legal definition of "adulterants" or "dilutants".

In a footnote to that case, we observed that, although neither party had raised the particular theory, under the wording of § 4.02(c) [which placed amphetamine in Penalty Group 2], the "controlled substance" was the material, compound, mixture, or preparation containing some quantity of a "listed controlled substance", such as amphetamine. *Reeves*, at 545, fn. 5. We stated that the State could seek a conviction for possessing, manufacturing, or delivering either the "pure" amphetamine or the material, compound, mixture, or preparation containing the amphetamine. *Id.* However, we did not pass on the issue directly as no charge under that theory was presented to the jury. *Id.*

### III.

#### A.

This case was tried and Appellant convicted on the theory that he "did intentionally and knowingly *manufacture* a controlled substance, to wit: Amphetamine, by aggregate weight, including any adulterants and dilutants, of more than 400 grams as set forth in the indictment."

The Department of Public Safety chemist described the material which the prosecution claimed and the Court of Appeals found to be "amphetamine" *viz:*

"[The 5000 milliliter flask of dark liquid] contained 704.89 grams of amphetamine, including adulterants and dilutants.... [T]he solution in the flask contained 76.20 grams of amphetamine base; that the remainder of the solution was reaction mixture containing bi-products of the manufacturing process and unused precursors; and that the amphetamine in the liquid had not

been extracted, distilled or separated from the other substances. * * * [T]hat the solution in the flask was not ready for distribution as amphetamine had not been extracted, distilled or separated from the other substances in the flask."

*Dowling v. State, supra* at 2, 3. The chemist further explained that after amphetamine is extracted, distilled or separated and "powdered out", the "remaining chemicals and liquids" left in the flask would be "just waste material". (Statement of Facts, Volume 3, p. 282).

#### B.

As stated previously, this case is governed by the 1983 version of the Texas Controlled Substances Act. Under that Act, controlled substance was defined as "... a drug, substance, or immediate precursor listed in Schedules I through V and Penalty Groups 1 through 4 of this Act." § 1.02(5).

"Amphetamine" along with other substances was listed in Penalty Group 3, *viz:*

"Penalty Groups 3. Penalty Group 3 shall include the following controlled substances:

(1) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system:

(A) Amphetamine...."

§ 4.02(d)(1)(A)

Proscribed conduct involving amphetamine was defined as an offense or an aggregated offense only in §§ 4.032(a) and (c) [manufactures, delivers with intent, *et cetera* ], and 4.042(a) and (c) [possesses], respectively. Thus, as pertinent here, a "person commits an offense if he knowingly or intentional manufactures ... a controlled substance listed in Penalty Groups 3"; "a person commits an aggravated offense if he commits an offense under Subsection (a) of this section and the amount of the controlled substance manufactured ... is by aggregate weight, including any adulterants and dilutants, 200 grams or more."

To "manufacture" meant the production, preparation, compounding, conversion or processing of the a controlled substance (other than marihuana), "either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, and includes any packaging or repacking of the substance or labeling or relabeling of its container[.]". § 1.02(16).[5]

## IV.

### A.

■ On rehearing the majority said that "the legislature intended to prohibit the possession, delivery or manufacture of materials, compounds, mixtures, or preparations containing amphetamine," and noted the *dicta* in *Reeves, supra;* accordingly the majority held that the indictment "must allege that the accused possessed, delivered, or manufactured a material, compound, mixture, or preparation if the State is to proceed under such theory." Opinion, at 109.

■ We reaffirm this holding with a slight clarification regarding the measure of the "material, compound, mixture, or preparation" in cases involving the manufacture of a controlled substance. In construing the language of a statute, it is presumed that the Legislature intended that every word of a statute is used for a purpose. *Polk v. State,* 676 S.W.2d 408, 410 (Tex.Crim.App.1984). The plain language of the statute in question states that a "material, compound, mixture, or preparation" containing *any* quantity of

amphetamine is a controlled substance. [HEALTH AND ·SAFETY CODE § 4.02(d)(1)(A) (1983 version) ]. (emphasis added). *See Boykin v. State,* 818 S.W.2d 782 (Tex.Crim.App.1991). Accordingly, it is the weight of this entire entity which is aggregate weight of the "controlled substance" and a person may be charged with possession, transfer or manufacturing of any "material, compound, mixture or preparation which contains any quantity of ... amphetamine", if such theory is alleged in the indictment.

This reading is also consistent with our analysis of this type· of language in *McGlothlin*[6] and *Reeves*[7]. Further, this reading is not inconsistent with the notion of adulterant and dilutants. By the very definitions of adulterants and dilutants[8], as announced in *McGlothlin,* the theory of adulterants and dilutants would not apply to materials, compounds, mixtures or preparations as adulterants and dilutants would already be subsumed in the "entity". Therefore it would not be necessary to show that the there are any "adulterants" or "dilutants" if prosecuting under material, compound, mixture, or preparation theory (hereafter referred to as the "entity" theory).

Our holding· today does not diminish the import of the theory of adulterants and dilutants. The adulterant and dilutant language, while having no effect in cases tried under the "material, compound, mixture, or preparation" language, still applies to the prosecution of offenses involving controlled substances which cannot be prosecuted under the "entity" theory (which are a majority of the listed controlled substances). This is

5. The trial court instructed the jury that "manufacture" meant "the production, preparation or processing of the controlled substance either directly or indirectly by means of chemical synthesis". Tr. 53. So far as this record and similar cases show, amphetamine is produced "independently" by means of chemical synthesis.

6. *See McGlothlin,* at 860–861, where we discussed the federal scheme ("total weight of mixture or substance containing a detectable amount of a controlled substance") and the Florida and Georgia schemes ("possession ... of [a controlled substance] or of any mixture containing the [controlled substance]"), stated that under those schemes the water at issue in the McGlothlin case would be clearly covered, and noted that

Texas had a similar scheme in penalty groups 3 and 4 which contained the "any material, compound, mixture, or preparation" language.

7. In *Reeves,* at 545, fn. 5, we stated that from the wording of the statute involving "amphetamine", the "controlled substance" prohibited could be a) a material, compound, mixture, or preparation containing the listed substance; or b) the listed substance in its pure form since a "material" could consist of 100% of the listed substance.

8. (Compounds, substances, or solutions added to the controlled substance with the intent to increase the bulk or quantity of the product without affecting its activity.) *McGlothlin,* at 860.

consistent with the general precepts of statutory interpretation.

■ However, in the instant case, the "entity" theory has no place, as the State did not allege such a theory in the indictment, did not submit such theory to the jury and thus cannot rely on such language to support the conviction.

### B.

Even if the State had proceeded on an "entity" theory, the conviction would not stand under the facts of this case, because this case involved the manufacturing of a controlled substance.

We are aware that the application of the "entity" theory to a manufacturing case presents particularly difficult problems, primarily related to the issues of what should be considered a "material, compound, mixture, or preparation". Need the substance be a final, usable entity? Would a suspension of partially processed amphetamine in a liquid in which it is "cooking" be considered a "material, compound, mixture, or preparation" under the statute? What if the amphetamine has been thoroughly "cooked" but is still suspended in "storage" or "waste" liquid? Is that entire "entity" a controlled substance even though most of it is unusable and/or will be discarded before the amphetamine is ingested?

These questions, in relation to the "material, compound, mixture, or preparation" are an issue of first impression in Texas. The only other jurisdiction to consider this particular issue is the federal system. The federal courts (whose controlled substances scheme, admittedly, contains somewhat different language than our own [9]) are divided on this issue [10]. There is, however, some support in the federal [11] system for a distinction between items which are mere waste products of the manufacture of a controlled substance and items which will add to the ultimate bulk of the controlled substance.[12]

■ Carefully considered, Texas statutes proscribing "Unlawful Manufacture" of controlled substance contemplate a finished product. The offense is committed when one "manufactures"[13] a controlled substance; punishment is graded by the amount of the controlled substance "manufactured". The terms connote a completed product of the manufacturing process. See Goff v. State, 777 S.W.2d 418 (Tex.Crim.App.1989) (that 15.2 grams of methamphetamine [suspended for "purification" in ether and acetone solu-

---

**9.** Most notable are the federal guidelines which provide "Unless otherwise specified, the weight of a controlled substance ... refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance". (Note following Drug Quantity Table; United States Sentencing Guidelines § 2D1.1).

**10.** See U.S. v. Walker, 960 F.2d 409 (5th Cir. 1992) (use entire weight of mixture or substance, even if toxic liquid waste material with only small percentage of methamphetamine); U.S. v. Innie, 7 F.3d 840 (9th Cir.1993) (plain language of statues required that entire amount of mixture of substance be used even if impure and poisonous); Compare U.S. v. Rolande–Gabriel, 938 F.2d 1231, 1238 (11th Cir.1991) (holding that term "mixture" under federal guidelines does not include unusable mixtures); also U.S. v. Newsome, 998 F.2d 1571 (11th Cir.1993); and U.S. v. Jennings, 945 F.2d 129, 136 (6th Cir.1991) (inappropriate to consider entire weight of mixture if there was no possibility it could be distributed to consumers and it would not increase the amount of methamphetamine available for distribution).

**11.** Jennings, at 137 (for sentencing purposes, weight limited to amount of methamphetamine the defendant was capable of producing); Newsome, at 1579; Rolande–Gabriel, at 1238.

**12.** We have also indicated some recognition for the propriety of including the weight of items that do or will add to the bulk of a final product. See McGlothlin, at 860, fn. 8 ("The State argues that the legislative intent is clear, 'to see that drug users, pushers and drug manufacturers do not get the benefit of being caught at a 'lucky' point in their manufacturing or cutting of the drug for sale or use ... [amphetamine] is always found with other substances—water and other chemicals used in manufacture or added later to facilitate use and sale of the basic drug'. We fail to see how the definition which we have approved would allow an offender to get 'lucky' and avoid conviction for an increased offense. If an agent adds to the bulk of the final product it is included in the total weight of adulterants and dilutants. *This includes agents added during manufacturing which will increase the bulk of the yet unfinished product.*") (emphasis added).

**13.** TEX.HEALTH & SAFETY CODE §§ 481.115, 481.116, 481.117, 481.118.

tion for total weight of 4.9 pounds] "had been completed through the manufacturing process" sufficient to show Appellant "manufactured" only 14.2 grams—not more than 400 grams as alleged—of methamphetamine; neither ether nor acetone is an "adulterant" or "dilutant").

Therefore by-products, waste materials, unused precursors [14], etc. should not be part of a definition of a controlled substance in a manufacturing case. Rather, the "material, compound, mixture, or preparation" must be in a usable form in order to be a controlled substance in a manufacturing case. If a substance is not usable, it has either not been fully manufactured (in which case, a charge may be made of attempted manufacture) or else it is not a controlled substance (such as in the case of sludge or waste).

■ Accordingly, we now hold that in a prosecution for manufacture of "amphetamine," alleged to have occurred prior to September 1, 1989, the State may not prove the aggregate weight alleged by claiming the entire weight of the "solution" or "product" as a "material, compound, mixture or preparation", containing a quantity of "amphetamine" unless it is proven that the controlled substance is in a usable form [15].

■ If the controlled substance is not in a usable form, the State may allege attempted manufacture [16] of a "material, compound, mixture, or preparation containing amphetamine" and, if it is proven that the liquid or solid portion of the entity, apart from the listed substance, is either a part of, or capable of being made into part of, a usable entity, then that portion may be counted toward the weight of the entire entity.

For example, if 0.5 grams of amphetamine is found suspended in 200 grams of a liquid made up of ingredients which will make more amphetamine or a usable entity containing amphetamine (but in its present state the amphetamine-liquid entity is unusable), that liquid may be counted toward the weight of the entity in an attempted manufacture case and the state may prove that the ingredients would have made "x" grams of amphetamine or of a "material, compound, mixture, or preparation including amphetamine." Alternatively, the State could charge the defendant with manufacture of the 0.5 grams of amphetamine.

■ If on the other hand, 0.5 grams of amphetamine is found suspended in 200 grams of a liquid which is a waste or by-product of the manufacturing process and incapable of being a usable entity or being made into a usable entity, then the State could only charge the defendant with manufacture of 0.5 grams of amphetamine.

This analysis would provide for a heavier punishment for a defendant who has manufactured or attempted to manufacture a large *usable* amount of a controlled substance than for a defendant who has manufactured or attempted to manufacture a small amount of a controlled substance which is still mixed with unusable by-products and waste products.

■ In the present case, then, even if the State had alleged that Appellant had manufactured a "material, compound, mixture or preparation ... containing amphetamine", because there was no proof that the entity was in a usable form, the conviction could not be sustained on that ground.[17]

14. However, if the State proves that there are "immediate precursors" their weight could be included in the aggregate weight of the controlled substance as per 1.02(5) [now HEALTH AND SAFETY CODE § 481.002(5)].

15. By a "usable form", we do *not* mean that the substance must be "street ready". Rather, as our examples make clear, our concern is that there must be some final manufactured product which is identifiable as a controlled substance. The fact that the controlled substance may remain suspended in a "carrier" liquid or some other solution does not diminish the finality of

the manufacturing process or the "usability" of such substance from a prosecutorial standpoint.

16. We note that attempted manufacture of a controlled substance carries the same penalty as manufacture of a controlled substance. *See* HEALTH AND SAFETY CODE, Section 481.108 (Vernon Pamphlet 1992).

17. We note that the State could have prosecuted this as a case of attempted manufacturing, but express no opinion as to whether the State could have proven an aggravated amount as that issue is not before us.

## V.

■ On rehearing, the majority opinion can be read to say that if the phrase is alleged in the indictment, proof of the "aggregate weight" of a controlled substance must show "the weight of the named substance" and any proven "material, compound, mixture, or preparation containing the substance." Opinion, at 109. As much as that can be read as our holding, today we modify that holding. As the controlled substance is the "material, compound, mixture, or preparation containing any quantity of amphetamine", it is only necessary to prove, in accordance with our previous admonition about usable form/entity, the aggregate weight of this entire entity and that the entity does in fact contain a quantity of amphetamine. It is not necessary to prove the separate weights of amphetamine and the non-amphetamine portion.

## VI.

We note that our holding today will have a very limited effect, applying only to such crimes committed prior to September 1, 1989. In 1989, the legislature amended the then § 4.02 of the Controlled Substances Act [now Health and Safety Code § 481.101]. Prior to such amendment, the section provided that "For the purpose of establishing criminal penalties for violation of this chapter, controlled substances are divided into Penalty Groups 1 through 4". After the amendment, the section read, "For the purpose of establishing criminal penalties for violations of this chapter, controlled substances, *including a material compound, mixture or preparation containing the controlled substance,* are divided into Penalty Groups 1 through 4." Acts 1989, 71st Leg., ch. 776 § 21 (S.B. 29). The bill analysis for S.B. 29 indicates that this amendment was made to "qualify (*sic*) that violations of this Act can be made with material, compound, mixture, or preparation containing the controlled substance in addition to just the pure controlled substance." Section 21 was originally part of House Bill 440 from that same session and a review of the original language of that bill and of the tapes of public hearings held on that bill indicate that the intent of the bill was to override this Court's decision in *McGlothlin* and change the definition of controlled substance to include a material, compound, mixture, or preparation containing any detectable amount of a listed substance. (Tape of 2/20/93 meeting of House Criminal Jurisprudence Committee).

According to the legislative history, the author of H.B. 440 was under the impression that *McGlothlin* did not allow prosecutions under the "material, compound, mixture, or preparation" language and apparently sought to bring the statute "into line with" the original legislative intent and federal law. (Tape of 2/20/93 meeting of House Criminal Jurisprudence Committee). In some respects, this was a misinterpretation of the existing statutes and a misreading of *McGlothlin*, as some controlled substances (including amphetamine) already contained the "material" language and this Court never passed on that issue in *McGlothlin*. It is possible that this Court's imprecise characterization of amphetamine as a Penalty 2 group controlled substance and thus implicitly not part of the penalty groups that contained the "material, compound, mixture, and preparation" language, may have led to this confusion.

■ In light of the plain language of the those passages of the Act which refer to "Any material, compound, mixture, or preparation containing any amount of . . . [certain listed substances]", this amendment had the effect of expanding the option of prosecuting under the "entity" theory to *all* items listed in the Penalty Groups, not just those which already contained the specified language. Thus, for offenses occurring after September 1, 1989, prosecutors have the option of charging a person with the possession, delivery, or manufacturing of any material compound, mixture, or preparation of *any* substance listed under Penalty Groups 1–4 [18].

18. However, the State would have to specifically charge a person under that theory as the Legislature's change clearly indicates two modes of prosecution—the controlled substance and any "material, compound, mixture, or preparation containing the controlled substance". If this "entity" theory is not alleged in the indictment, then the State would be limited to the actual definition of the specific controlled substance

However, this recent expansion would in no way diminish the State's authority to prosecute drug offenses which occurred prior to the amendment (such as the instant case) under the "material, compound, mixture, or preparation" theory for such listed substances such as amphetamine, where such language was already present in the description of such controlled substances.

## VII.

Therefore, while clarifying and modifying certain earlier holdings, for reasons developed in this opinion, we adhere to and confirm our ultimate disposition of this cause on Appellant's motion for rehearing. The judgment of the Court of Appeals is reversed and this cause is remanded to the trial court with instructions to enter a judgment of acquittal.

McCORMICK, P.J., and WHITE, J., dissent.

MALONEY, J., concurs with note: Believing that my opinion on Appellant's Motion for Rehearing on Appellant's Petition for Discretionary Review correctly states the law and that we should not have granted rehearing on our own motion subsequently, I can only concur in the result reached here.

CAMPBELL, J., joins J. MALONEY'S note.

OVERSTREET, J., joins J. MALONEY'S note.

---

(plus adulterants and dilutants if they are alleged).

1. Texas Controlled Substances Act effective in September 1983 is the "Act" applicable here.

All emphasis throughout this opinion is mine unless otherwise indicated. Also, because the preliminary statement and Part I of the opinion of the Court reproduces substantial portions of my proposed opinion for the Court, to avoid as much redundancy as reasonably feasible here I will provide in context that which it pretermits where appropriate.

2. Regarding the allegation that appellant "possessed with intent to manufacture [amphetamine]," I have not found any case explaining how one could possess amphetamine with intent to manufacture amphetamine. Cf. Blackmon v.

## CONCURRING OPINION ON REHEARING ON COURT'S OWN MOTION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

[Filed June 29, 1994]

CLINTON, Judge, concurring.

The indictment in this cause alleged in each of three counts that appellant did "intentionally and knowingly *manufacture* and *possess with intent to manufacture* and deliver [stated amount] of a controlled substance, to-wit: Amphetamine."[1] The trial court authorized the jury to convict if it found that appellant did "intentionally or knowingly *manufacture* a controlled substance, to-wit: Amphetamine, by aggregate weight, including any adulterant or dilutants, of *more than 400 grams*."[2]

### I

#### A

The Texas Controlled Substances Act was originally enacted twenty years ago. Acts 1973, 63rd Leg., Ch. 429, p. 1132 (H.B. 447), effective August 27, 1973. The original bill tracked a model controlled substances act submitted to the states by a Federal agency; the latter in turn followed the format and contained provisions drawn from the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970, which the Legislature dubbed the "Federal Controlled Substances Act." The Uniform Controlled Substances Act, 9 Uniform Laws Annotated, Master Edition, and the federal scheme classified all

---

*State,* 786 S.W.2d 467, at 469 (Tex.App.—Houston [1st] 1990), PDR refused (questioning propriety of such pleading when offense shown is possession of final product). More broadly stated, I have not discovered any suggestion in opinion or literature that any controlled substance could be possessed with intent to manufacture *by means of chemical synthesis* the same controlled substance. The only exceptional situation coming to our attention is found in cases from other jurisdictions where the offense may be committed under the state law when one *possesses* a "marihuana" plant with intent to *manufacture* marihuana by harvesting the plant and reducing its leaves to smokeable material. Of course, in Texas *marihuana* is not listed as a "controlled substance" in any penalty group, and is *excepted* from the definition of "manufacture." Cf. § 1.02(5) and (16).

substances to be controlled into *schedules* for both regulatory and penal purposes according to authoritatively determined relevant factors, *inter alia* actual or relative potential for abuse, rather than amount involved; there were no "penalty groups," as such. See 21 U.S.C.A. § 801, *et seq.*, particularly §§ 812 and 841(a)(1). Our Legislature chose another format, however. See *Ex parte Wilson,* 588 S.W.2d 905 (Tex.Cr.App.1979) (Clinton, J., concurring and dissenting, at 911–912); *Ex parte Tipton,* 617 S.W.2d 262 (Tex. Cr.App.1981) (Clinton, J., concurring, at 264, n. 2).

The Legislature did take from the "Federal Controlled Substances Act" and the Uniform Act certain language used to classify separately, by group, named controlled substances according to their nature or effect, *viz:*

"any material, compound, mixture, or preparation which *contains any quantity* of the following [e.g., *hallucinogenic* substances, substances having a potential for abuse associated with a *stimulant* effect on the central nervous system, substances having a potential for abuse associated with a *depressant* effect on the central nervous system, et cetera]."

H.B. 447 §§ 2.03(d), 2.04(d) & 2.05(d), at 1137–39. Section 4.02 of the original act prescribed criminal classifications in order to establish penalties for "violation of a provision of this Act," according to "penalty groups" of controlled substances. *Id.* H.B. 447, at 1148.[3] More particularly, in Penalty Group 3, § 4.02(d)(1) lists under that description: "(A) amphetamine, its salts, optical isomers, and salts of its optical isomers." *Id.,* at 1151.

Section 4.03(a) [with § 4.04(a) ] defined certain offenses violative of the Act, in terms that a person "knowingly or intentionally manufactures, delivers, or possesses with intent to manufacture or deliver [or possesses] a controlled substance listed in Penalty Groups 1, 2, 3, or 4." Subsection (b) then

matched a substance in a particular penalty group with a prescribed degree of felony or class of misdemeanor; thus, for example, an offense involving amphetamine was a felony of the third degree, except that "simple" possession was a Class A misdemeanor.

In 1974 Bancroft–Whitney published three volumes of *Texas Annotated Penal Statutes With Forms* (Branch's 3rd Ed.), acknowledging "the participation of the Texas District and County Attorneys Association in the preparation of this work." 1 Branch's at vi. In 1978 it published Volume Four in the same format of "helpful features," e.g., explanatory comments, checklists of elements necessary to establish an offense, suggested form of charging instruments and suggested jury charges.

Explained at the outset is that in subchapter 4 are found

"penalty groups, of which there are four, deal[ing] with controlled substances.... When a person is *charged with an illegal act* relating to a controlled substance, the seriousness of the offense and the severity of the *punishment is dependent upon which penalty group* the controlled substance is found. In this regard, *there are five major OFFENSES defined in the Texas Controlled Substances Act.* These are: § 4.03, Unlawful Manufacture or Delivery of Controlled Substances; 4.04, Unlawful Possession of a Controlled Substance.... [T]he *punishment for a violation depends on which penalty group* the drug in question is found."

*Id.,* at 3.

Following the text of §§ 4.03 and 4.04 are checklists of elements, forms of charging instruments and forms of charges pertinent to each respective offense. None includes a theory of prosecution for "any material, compound, mixture or preparation of any quantity of the following substances[.]" Instead, each specifies "a controlled substance" and the "name of controlled substance." *Id.,* at 92–93, 154–155.

---

**3.** Except for Penalty Group 1, *id.,* (b), many a group or subgroup is described at the outset as including "any material, compound, mixture, or preparation" which contains (or containing) any quantity (or limited quantities) of the following

... substances (or narcotic drugs).... See Penalty Group 2, *id.,* (c), at 1151; Penalty Group 3(1), (3), (5), (6), (7) and (8), *id.,* (d), at 1151–1153; Penalty Group 4, *id.,* (e), at 1153.

Where, as here, the offense alleged is manufacture of amphetamine, the suggested operative part of an indictment is simple and straightforward, *viz:*

"[named defendant] did then and there knowingly and intentionally manufacture a controlled substance, namely: [amphetamine]."

*Id.,* at 94. Because amphetamine is a named controlled substance that is specifically listed in only one penalty group, there was no reason to allege more about its "criminal classification." See and compare *Benoit v. State,* 561 S.W.2d 810, at 814–815 (Tex.Cr. App.1977); *Ex parte Wilson,* 588 S.W.2d 905, at 908–909 (Tex.Cr.App.1979); see also *Taylor v. State,* 610 S.W.2d 471, at 478–479 (Tex. Cr.App.1980).

Likewise, preliminary and application paragraphs in the jury charge are direct and to the point, *viz:*

"Our law provides that a person commits an offense if he knowingly or intentionally manufactures a controlled substance.

Our law further provides that [amphetamine] is a controlled substance.

Now if you find from the evidence beyond a reasonable doubt that the [named defendant] ... did knowingly or intentionally manufacture a controlled substance, namely [amphetamine], then you will find the defendant guilty as charged, but if you do not so believe, or if you have reasonable doubt thereof, you will acquit the defendant."

*Id.,* at 95–96. *Accord: Texas Criminal Pattern Jury Charges* (State Bar of Texas 1974), CPJC (CS) § 4.03, at 731–732.

Six years later the Legislature revised both schedules and penalty groups to change the classification of certain controlled substances and to add others, leaving amphetamine in Penalty Group 3; it did not, however, amend definitions of offenses. Acts 1979, 66th Leg., Ch. 598, p. 1278 (S.B. 322), effective August 27, 1979.

### B

In its next session the Legislature adapted the concept of "aggravated offenses" to the Texas Controlled Substances Act, as part of a "declared war on crime, especially drug related crime." Wendorf, *The War on Crime: 1981 Legislation,* 33 Tex.Tech.L.Rev. 765. As the Court notes, "It made no change in content to 'criminal classification' by penalty groups." Slip Opinion, at 3.

Obviously reacting to adverse decisions denying applicability of penal code provisions denouncing preparatory offenses to alleged "attempts" to commit substance offenses under the Act, e.g., *Brown v. State,* 568 S.W.2d 137 (Tex.Cr.App.1978), and *Moore v. State,* 545 S.W.2d 140, at 142 (Tex.Cr.App.1976), the Legislature corrected the situation conformably with newly provided "aggravated offenses," *viz:*

"Sec. 4.011. The provisions of Title 4, Penal Code, apply to Section 4.052 [Illegal Investment] and offenses designated as aggravated offenses under Subchapter 4 of this Act, except that the punishment for a preparatory offense is *the same as* the punishment prescribed for the offense that was the object of the preparatory offense."

See *Wendorf,* supra, at 779. See now V.T.C.A. Health & Safety Code § 481.108.

Contemporaneously with the 1981 legislation revamping, *inter alia,* definitions of certain existing offenses to provide punishment according to "aggregate weight, including adulterants and dilutants," Acts 1981, 67th Leg., Ch. 268, p. 696 (H.B. 730), effective September 1, 1981, the Legislature defined "drug paraphernalia" to include, *inter alia,* "a diluent or adulterant" as defined, and extensively amended § 4.07 to proscribe several offenses involving "drug paraphernalia." Acts 1981, 67th Leg., Ch. 277, p. 742 (H.B. 733), effective September 1, 1981.

After H.B. 730 was held unconstitutional, the Legislature revised, codified and reenacted many substantive and procedural laws previously enacted separately, without modifying penalty groups, however. Majority Opinion, at 107. Later it separately added and classified substances in schedules and

penalty groups, this time without modifying existing offenses as previously defined. Id., at 107–108.[4]

## II

## A

So far as reasonably diligent research reveals, not until the opinion on original submission in this very cause was it ever *held* by this Court that the theory of prosecution at issue is viable. But see and compare conceded *dicta* in *Reeves v. State*, 806 S.W.2d 540, at 545, n. 5 (Tex.Cr.App.1990).

Keeping in mind that V.T.C.A. Penal Code, Title 1, § 1.03(a) dictates, "Conduct does not constitute and offense unless it is *defined as an offense by statute* [et cetera];" that *id.*, § 1.03, *inter alia*, makes provisions of Title 1 (2 and 3) applicable to "offenses defined by other laws, unless the statute defining the offense provides otherwise;" that the Act does not provide otherwise; that, indeed, since 1981 the Act has expressly incorporated by reference Title 4, Penal Code, to make "preparatory offenses" such as "attempts" apply to aggravated offenses proscribed in subchapter 4 of the Act, we focus on statutory provisions defining the offense and other germane provisions implicated by the facts of the instant cause. Practice Commentary to § 1.03; see, e.g., *Childress v. State*, 784 S.W.2d 361, at 362 (Tex.Cr.App.1990); *Gutierrez v. State*, 628 S.W.2d 57, at 61 (Tex.Cr. App.1980).

---

**4.** Consistent separate legislative treatment of "criminal classification" by penalty groups on the one hand and "definitions of offense" on the other, tracked in Part I, *ante*, demonstrates that the essential connection between the two is, as it always has been, that the former lists by name the controlled substance the latter only alludes to in defining an offense. That is the reason the Court held in certain situations the charging instrument must identify the specific penalty group listing the offense alleged, or *if not listed*, be otherwise described as it is in a penalty group. See, e.g., *Benoit v. State, Ex parte Wilson* and *Taylor v. State*, all supra.

Moreover, we know from this cause, companion causes and others before the Court that grand juries have not and are not indicting, and judges have not and are not charging jurors, on a prosecutorial theory based on the "material, compound, mixture or preparation" language in any penalty group. The offense has been alleged and the jury charged either by stating forbidden conduct involving a named controlled substance

## B

This case was tried and appellant was convicted on the theory that he "did intentionally and knowingly *manufacture* a controlled substance, to-wit: *Amphetamine*, by aggregate weight, including any adulterants and dilutants, of *more than 400 grams* as set forth in the indictment." Tr. 12 and 54.

The DPS chemist described the stuff the prosecution claimed and the court of appeals found to be "amphetamine," *viz:*

"[The 5000 milliliter flask of dark liquid] contained 704.89 grams of amphetamine, including adulterants and dilutants.... [T]he solution in the flask contained 76.20 grams of amphetamine *base;* that the remainder of the solution was reaction mixture containing bi-products [sic] of the manufacturing process and (some) unused *precursors* (unchanged *precursors*); and that the amphetamine in the liquid had *not* been extracted, distilled or separated from the other substances. * * * [T]hat the solution in the flask was *not ready for distribution as amphetamine;* and that the *amphetamine had not been extracted, distilled or separated from the other substances* in the flask."

*Dowling v. State*, supra, at 2, 3 (words in parenthesis from 3 S.F. 270).[5] The chemist

---

or, since the concept of aggravated offenses was adopted, by so stating and then alleging the aggravated weight, with or without "adulterants and dilutants." See, e.g., *McGlothlin v. State*, 749 S.W.2d 856 (Tex.Cr.App.1988) (concurring opinion of Clinton, J., cases cited at note 1); see also *Thompson v. State*, 885 S.W.2d 136 (Tex.Cr. App. Nos. 1992). See also suggested forms for charging instruments and jury charges in such helpful works as McCormick & Blackwell, Texas Criminal Forms and Trial Manual, Chapter 23, 7 Texas Practice 153, and Chapter 111, 8 Texas Practice 738, respectively, and McClung, Jury Charges for Texas Criminal Practice (Revised Edition 1983) 228–231; *Id.*, (Revised Edition 1992) 213–219.

**5.** The State through its district attorney says:
"During the manufacturing, or 'cooking' process, numerous precursor chemicals are combined, and heated. Over a period of several hours, the precursor chemicals combine (by chemical synthesis), and are 'washed,' or separated in a process involving water, to make

further explained that after amphetamine is extracted, distilled or separated and then "powdered out," the "remaining chemicals and liquids" *left in the flask* would be *"just waste material." Id.,* at 282.

" 'Controlled substance' means a drug, *substance,* or immediate precursor *listed* in Schedules I through V and Penalty Groups 1 through 4 of this Act." § 1.02(5).

"Amphetamine" along with other substances is listed in Penalty Group 3, *viz:*

"Penalty Group 3. Penalty Group 3 shall include the following controlled substances:

(1) Any material, compound, mixture, or preparation which contains any quantity of the following substances having a potential for abuse associated with a stimulant effect on the central nervous system:

(A) Amphetamine ..."

§ 4.02(d)(1)(A).

Proscribed conduct involving amphetamine is defined as an offense or an aggravated offense only in §§ 4.032(a) and (c) [manufactures, delivers or possesses with intent *et cetera*], and 4.042(a) and (c) [possesses], respectively. Thus, as pertinent here, "a person commits an *offense* if he knowingly or intentionally *manufactures* ... a controlled substance *listed* in Penalty Group 3;" "a person commits an *aggravated offense* if he commits an offense under Subsection (a) of this section and the amount of the controlled substance *manufactured* ... is, by aggregate weight, including any adulterants or dilutants, 200 grams or more."

To "manufacture" means the production, preparation, compounding, conversion or processing of a controlled substance (other than marihuana), "either directly or indirectly by extraction from substances of natural origin, or *independently by means of chemical synthesis,* or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of the substance or labeling or relabeling of its container[.]" § 1.02(16).[6]

### III

### A

On rehearing the majority said that "the legislature intended to prohibit the possession, delivery, or manufacture of materials, compounds, mixtures, or preparations containing amphetamine," and noted the *dicta* in *Reeves v. State,* supra; accordingly the majority held that the indictment *"must* allege that the accused possessed, delivered, or *manufactured* a material, compound, mixture, or preparation *if* the State is to proceed under such theory." Opinion, at 109. Upon further examination of germane provisions of the Act and after considerable reflection, we should be persuaded that the Act does not authorize such an alternative form of prosecution—certainly not on the facts of this case—not withstanding the "reaffirmation" of the original prior holding with "slight modification" followed by much complicated dicta about an "entity" theory in the present Majority Opinion, at 124–125, 125, 126–127.

Again, one who manufactures "a controlled substance *listed* in Penalty Group 3" commits an aggravated offense "if the amount of the controlled substance *manufactured* ... is, by aggregate weight, including any *adulterants or dilutants,* 200 grams or more." § 4.032(a) and (c).

---

amphetamine oil, which is later 'powdered' to make the *final product.... Adulterants and dilutants are not present,* unless one adheres to the theory that the more precursors added, the greater the amount of dope, in which case the precursors actually add to the bulk of the finished product. Precursor chemicals are a necessary part of the manufacturing process, and in the course of the manufacturing process, *precursor chemicals become a part of the final product.* Because precursor chemicals and by-products are always present during any given stage of the actual manufacturing process, it

seems unlikely that there will ever be 100% pure amphetamine (or other controlled substance) when the controlled substance is seized *before manufacture is completed."*
State's Brief, at 4–5.

**6.** The trial court instructed the jury that "manufacture" meant "the production, preparation or processing of the controlled substance *either directly or indirectly* by means of chemical synthesis." Tr. 53. So far as this record and similar cases show, amphetamine is produced *"independently"* by means of chemical synthesis.

From the beginning the Legislature defined "controlled substance" as a "drug, substance or immediate precursor *listed* in [schedules and penalty groups]," and it determined that the "substances *listed* in [schedules and penalty groups] shall be controlled substances." § 1.02(5) and § 2.01.

Indeed, it expressly explained the "nomenclature," *viz:*

> "The controlled substances *listed* or *to be listed* in the schedules in Schedules I, II, III, IV, and V and Penalty Groups 1, 2, 3, and 4 are included by whatever official, common, usual, chemical, or trade *name* they may be designated."

§ 2.02. Then in designating particular substances included in each schedule and penalty group, the Legislature took care to identify each "listed" controlled substance by *name,* even when classified in a group or sub-group according to general description, prescribed effect, commonality of relevant factors or otherwise. See Schedules, §§ 2.03–2.08; Authority to Control, § 2.09; Schedule Tests, §§ 2.10–2.14; and Criminal Classification, § 4.02; *Ex parte Tipton,* supra (Clinton, J., concurring) (§ 2.02 identifies controlled substance according to name by which designated in penalty group list).[7]

We should now hold that amphetamine is *eo nomine* a controlled substance. The descriptive statutory language merely justifies the Legislature in its classification of amphetamine by listing it as a controlled substance in Penalty Group 3 under § 4.02(d)(1). The descriptive language does not prescribe any element of an offense involving amphetamine and need not be alleged or proved; thus it is redundant and, as this record clearly reflects, to allege it will confuse the real issues in a "manufacturing" case. Accordingly, it follows that alleging such descriptive language in a charging instrument does not properly state an aggravated offense under § 4.03–2(a), (c) and (d)(2).

B

On rehearing the majority also said that if the phrase is alleged in the indictment, proof of the "aggregate weight" of a controlled substance must show "the weight of the named substance" and any proven "material, compound, mixture, or preparation containing the substance." Opinion, at 124.[8] Of course, the phrase is not alleged here and, as we determined *ante,* is not a viable theory of prosecution under the applicable statute.

The State through its district attorney and the State Prosecuting Attorney, respectively, stoutly maintain that the weight of the "entire solution" or "entire mixture" containing any quantity of "amphetamine base" should and must be taken into account in determining "aggregate weight" of the substance. State's Brief on Order Granting Rehearing;[9]

---

**7.** The Court has uniformly held that a charging instrument asserting offending conduct involving a purported substance "not *specifically named* in a penalty group" fails "to allege an offense against the State," unless the substance is otherwise "described in a penalty group." *Ex parte Tipton,* supra, and cases cited therein. Nothing in the Act as amended in 1981 and thereafter denigrates that rule for pleading an offense.

**8.** On original submission in testing sufficiency of the evidence the majority opinion stated that "the clear language [of § 4.032] shows the intent of the legislature to include substances not yet ready for street sales, i.e., '... the amount of the controlled substance ... with intent to manufacture.'"

One problem with that adumbrated quote is the second ellipsis omits the word *"possessed"* immediately preceding "with intent to manufacture." See § 4.032(b), (c) and (d)(1) and (2). Although initially alleged in the indictment, apparently the State abandoned the allegation, for the court instructed the jury only on "manufacture." We have already questioned the validity of asserting such an offense involving amphetamine. See note 2, *ante.* In any event, the alleged offense, "possesses with intent to manufacture," is no longer in the case.

**9.** The essence of reasoning of the district attorney is:

> "*Manufacturing* a controlled substance is very different from possessing or delivering a controlled substance, and that difference should be major factor when considering what constitutes the aggregate weight of the substance. Again, possession and delivery cases most often deal with *finished product,* while *manufacturing cases do not.* Therefore, there should be a distinction made between finished product which has clearly been 'cut' to increase the bulk of the product for sale on the street, and unfinished product which has been seized by law enforcement officers before the manufacturing process has been completed. With respect to solutions or mixtures which are in the process of being manufactured, the

State's Brief in Response to Order Granting Rehearing, *passim.*[10]

With deference, prosecutors advancing that theory should read again the proscription of "Preparatory Offenses" in § 4.011, then study *Baxter v. State,* 718 S.W.2d 28 (Tex.App.—Eastland 1986), PDR refused; *Martin v. State,* 727 S.W.2d 820 (Tex.App.—Fort Worth 1987), no PDR history; *Lindley v. State,* 736 S.W.2d 267 (Tex.App.—Fort Worth 1987), PDR refused, and replicate the "attempt" theory of prosecution for attempted manufacture of methamphetamine so successfully pursued by district attorneys of Stephens County and Wise County, respectively, to gain punishments of fifty years confinement and $25,000 fine, *Baxter,* at 28, and 30–31; seventy-five years confinement and $250,000 fine, *Martin,* at 821, and 822; seventy-five years confinement and $75,000 fine, *Lindley,* at 269.

Those cases effectuate the plain legislative intent to differentiate "attempted manufac-

---

entire solution should be considered as part of the aggregate weight of the product. This should be the case regardless of the state of manufacture the mixture is in when the process is interrupted by law enforcement. If the precursor chemicals have only been 'cooking' for a short period of time, then the quantity of 'pure' controlled substances is going to be very small. The rest of the mixture will be precursor chemicals and byproducts of the manufacturing process. Surely the Legislature did not intend to count only the portion of the mixture which is 'pure,' controlled substances; if that were the case, then the drug manufacturers could, in fact, 'get lucky,' depending upon when the laboratory was seized by law enforcement officers."

*Id.,* at 5–6 (first emphasis in original). As we demonstrate *post,* however, what the Legislature intended in such circumstances is that drug manufacturers be charged with and convicted of "*attempted* manufacture*"* of amphetamine, and thereby suffer the same sanctions as if they had ultimately produced an aggravated amount of amphetamine. Thus they could "get lucky" only when a prosecution is pursued on the flawed notion that weight of "entire solution" or "entire mixture" of chemicals still being "cooked" should be considered "as part of the aggregate weight of the product"—a "product" not yet "manufactured."

**10.** Much like the original opinion, the State Prosecuting Attorney reads the Act to support a similar proposition, *viz:*

"An examination of the language of [the Act] demonstrates a plain legislative intent to criminalize the possession, manufacture, or delivery of any 'material, compound, mixture, or preparation which contains any quantity of amphetamine.' Under the terms of the Act, the 'controlled substance' is not amphetamine. Rather, the 'controlled substance' is the mixture which contains any quantity of amphetamine."

Brief, at 3 (emphasis in original). In extensively developing that thesis, he alludes to certain provisions in the Uniform Controlled Substances Act of 1970 from which the Legislature drew its definition of "controlled substance" and the phrase "material, compound, mixture, or preparation;" reviewing decisions from other jurisdictions the State Prosecuting Attorney argues that every one is "grounded upon the principle that the [language in the phrase] defines offenses and penalties in terms of the weight of the mixture containing a controlled substance," and he finally comes to a rather innovative conclusion, *viz:*

"... Section 4.032 defines the offense in terms of the 'aggregate weight of the material, compound, mixture, or preparation which contains any quantity of amphetamine.' The additional phrase 'including adulterants or dilutants' does not *subtract* from Section 4.032's definition of the offense. Therefore, in a prosecution for manufacture of amphetamine under Section 4.032(a), (c) and (d)(2), the aggregate weight alleged may be proved by showing the weight of the 'material, compound, mixture, or preparation' containing a quantity of amphetamine base, without also showing such matter is, or contains, identified adulterant or dilutants."

*Id.,* at 36 (emphasis in original).

In fact, not only did the Uniform Act declare offenses in relation to perceived danger to society in the nature of the conduct, without at all quantifying it according *amount or weight of the substance* (as the Legislature did in 1981), cf. § 4.01, 9 ULA Part II, at 91, but it also cautioned that our own Act "departs from the official text [of the Uniform Act] in such a manner that the various instances of substitution, omission and additional matter cannot be clearly indicated by statutory notes." *Id.,* at 7.

Moreover, in fact, none of the decisions from other jurisdiction concerned a "manufacturing scenario;" every one dealt with some other offense involving a *finished product,* i.e., possession, possession with intent to distribute, delivery (trafficking), or a sale. Indeed, the oldest cited case construes a 1963 New York law which differentiated penalties: possession of a "pure" drug was a Class A misdemeanor, but a "mixture" was Class A through D felony depending on the total amount—the governing notion being that certain substances are "generally marketed in a diluted or impure state." United States ex rel. Daneff v. Henderson, 501 F.2d 1180, at 1184 (CA2 1974). Several of the decisions summarized by the State Prosecuting Attorney relied at least in part on such rationale. See also *Chapman v. United States,* 500 U.S. 453, at 460, 111 S.Ct. 1919, at 1925, 114 L.Ed.2d 524 (1991).

ture" and "manufacture" of an aggravated amount of certain controlled substances such as amphetamine, as well as methamphetamine, yet punish the former "attempted offense" within the same range as the latter "completed" one.

Carefully considered, the statutes proscribing "Unlawful Manufacture" of controlled substance contemplate a finished product. The offense is committed when one "manufactures" a controlled substance; punishment is graded by the amount of the controlled substance "manufactured." The terms connote a completed product of the manufacturing process. *Goff v. State*, 777 S.W.2d 418 (Tex.Cr.App.1989) (that 15.2 grams of methamphetamine [suspended for "purification" in ether and acetone solution for total weight of 4.9 pounds] "had been completed through the manufacturing process" sufficient to show appellant "manufactured" only 15.2 grams—not more than 400 grams, as alleged—of methamphetamine; neither ether nor acetone is "adulterant" or "dilutant"). See *Conner v. State*, 757 S.W.2d 806 (Tex.App.—Tyler 1988) (evidence of glass jar containing 1,984 grams of liquid consisting of only 2% methamphetamine, baggie containing 210.5 grams of material consisting of only 47% methamphetamine, second baggie containing 5.2 grams of material estimated to consist of 50% methamphetamine—aggregating about 140 grams of "poor" methamphetamine because by-products therein lowered purity of drug—insufficient to prove *manufacture* of more than 400 grams of methamphetamine in that no evidence substances other than methamphetamine were "adulterants or dilutants" intended to increase the bulk of the final product). *Id.*, at 808.[11]

Accordingly, we ought to hold that in a prosecution for manufacture of amphetamine the State may not prove the aggregate weight alleged by claiming the entire weight of the "solution" as a "material, compound, mixture or preparation," containing a quantity of "amphetamine base." Because it had not been extracted, distilled or separated from "unused" or "unchanged" precursor chemicals and by-products in the flask, we should further hold under the facts of this cause that "amphetamine base" is not a finished product of the manufacturing process.

## IV

### A

In all likelihood, had the State charged Goff with attempted manufacture of methamphetamine it would have achieved a conviction and assessment of stiff punishment in Gregg County, instead of the judgment of acquittal this Court ordered in *Goff*, supra, at 421.

In a prosecution under the "attempt" theory the State is permitted to adduce opinion and expert testimony supporting the proposition that continuation of manufacturing process without interruption could have produced the maximum amount of amphetamine alleged. Compare testimony in *Baxter v. State*, supra, at 30–31, and *Martin v. State*, supra, at 822, and *Conner v. State*, supra, at 808, with absence of any such evidence in *Goff*, at 420 and n. 2. Moreover, an expert witness might be allowed to estimate the likely percentage of "pure" amphetamine in the finished product, and explain how then adding adulterants and dilutants to "cut" the finished product would increase its "aggregate weight," so that an even greater amount would be available for wholesale distribution and, in turn, after being "cut" again, for retail delivery and sale. In sum, the prosecution may easily gain more punishment and penalty by presenting "probabilities" than by straining to expand "reality."[12]

---

11. Compare *Blackmon v. State*, 786 S.W.2d 467, at 471–473 (Tex.App.—Houston [1st] 1990), PDR refused (particular evidence found in methamphetamine lab, i.e., bag with 71.703 grams methamphetamine (exhibit 37) and jar/bag of powder containing 146.5 grams of methamphetamine (77.645 grams) and the balance an adulterant (granulated sugar) proved "possession with intent to manufacture at least 200 grams [of methamphetamine], as alleged," although the court of appeals recognized "clearer" charging instrument would have alleged simply did "possess methamphetamine" and strongly recommended State amend form indictment "to give such notice," *id.*, at 469).

12. The concept of "aggravated offenses" implemented effective September 1, 1981, necessarily introduced the determinative feature of assaying "aggravated weight, including adulterants and

## B

Therefore, for reasons developed in this opinion, I concur in the judgment of the Court reversing the judgment of the court of appeals and remanding the cause to the trial court for entry of an acquittal—without further ado.[13]

dilutants," of the listed controlled substance "manufactured, delivered or possessed [with requisite intent]." Under prior statutes, indictment, evidence and jury charge focused on identity of the listed substance as alleged; its composition, content and weight were not legally implicated or consequential, although in practice parties might argue their bearing on punishment. Therefore, judicial decisions under prior statutes concerning "manufacturing" have no particular precedential value today. See, e.g., *Gish v. State,* 606 S.W.2d 883, at 886–887 (Tex.Cr.App.1980); see also *Fronatt v. State,* 630 S.W.2d 703, at 704 (Tex.App.—Houston [1st] 1981), PDR refused, and *Berryhill v. State,* 630 S.W.2d 812, at 813–

814 (Tex.App.—Houston [1st] 1982), no PDR history (companion cases arising from same September 17, 1979 scenario).

13. In Part VI of its opinion the majority renders an advisory opinion regarding the reach and application of its "entity" theory under a 1989 legislative enactment. *Id.,* at 127–128. Because we have so often proclaimed that this Court will not issue an advisory opinion, I disassociate myself from this one.